# 14-1315-cv

## In the United States Court of Appeals for the Second Circuit

———————————————

JOHN CHEN, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant*

v.

MAJOR LEAGUE BASEBALL PROPERTIES, INC., THE OFFICE OF THE COMMISSIONER OF BASEBALL, DBA MAJOR LEAGUE BASEBALL,

*Defendants-Appellees*,

MAJOR LEAGUE BASEBALL, MAJOR LEAGUE BASEBALL ENTERPRISES, INC.,

*Defendants*.

———————————————

On Appeal from the United States District Court
for the Southern District of New York
Case No. 13-cv-5494 (The Honorable John G. Koeltl)

—————————————————————————

## APPENDIX FOR PLAINTIFF-APPELLANT JOHN CHEN

—————————————————————————

Justin M. Swartz
Juno Turner
Michael N. Litrownik
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, NY 10016
(212) 245-1000

Deepak Gupta
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

*Counsel for Plaintiff-Appellant*

**i**

## TABLE OF CONTENTS

| | Page |
|---|---|
| District Court Docket Entries ................................... | A-1 |
| First Amended Class Action Complaint, dated November 25, 2013 ................................ | A-9 |
| Opinion and Order of USDJ John G. Koeltl, dated March 25, 2014, Appealed From ........................... | A-43 |
| Notice of Appeal, dated April 23, 2014 .................... | A-70 |

A-1

CLOSED,APPEAL,ECF

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:13−cv−05494−JGK**

Chen v. Major League Baseball Properties, Inc., et al
Assigned to: Judge John G. Koeltl
Cause: 29:201 Fair Labor Standards Act

Date Filed: 08/07/2013
Date Terminated: 03/31/2014
Jury Demand: Plaintiff
Nature of Suit: 710 Labor: Fair Standards
Jurisdiction: Federal Question

**Plaintiff**

**John Chen**
*on behalf of himself and all others*
*similarly situated*

represented by **Juno Emmeline Turner**
Outten &Golden,LLP (NYC)
3 Park Avenue, 29th Floor
New York, NY 10016
(212) 245−1000
Fax: (212) 977−4005
Email: jturner@outtengolden.com
*ATTORNEY TO BE NOTICED*

**Justin Mitchell Swartz**
Outten &Golden,LLP (NYC)
3 Park Avenue, 29th Floor
New York, NY 10016
(212) 245−1000
Fax: (212) 977−4005
Email: jms@outtengolden.com
*ATTORNEY TO BE NOTICED*

**Michael Noah Litrownik**
Outten &Golden,LLP (NYC)
3 Park Avenue, 29th Floor
New York, NY 10016
(212)−245−1000
Fax: (646)−509−2091
Email: mlitrownik@outtengolden.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Major League Baseball**
*TERMINATED: 10/02/2013*

represented by **Elise Michelle Bloom**
Proskauer Rose LLP (NY)
11 Times Square
New York, NY 10036
(212)969−3000 x3410
Fax: (212)969−2900
Email: ebloom@proskauer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Samson Fox**
Proskauer Rose, LLP
11 Times Square
New York, NY 10036
(212) 969−3507
Fax: 212 969−2000
Email: jfox@proskauer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Diamant Kaufman**
Proskauer Rose LLP (NY)
11 Times Square
New York, NY 10036
(212) 969–3345
Email: seth.kaufman@ogletreedeakins.com
*TERMINATED: 05/09/2014*
*LEAD ATTORNEY*

**Mark W. Batten**
Proskauer Rose LLP (Boston)
One International Place
Boston, MA 02110
(617) 526–9600
Fax: (617) 526–9899
Email: mbatten@proskauer.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Major League Baseball Properties, Inc.**          represented by  **Elise Michelle Bloom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Samson Fox**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Diamant Kaufman**
(See above for address)
*TERMINATED: 05/09/2014*
*LEAD ATTORNEY*

**Mark W. Batten**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Office of the Commissioner of
Baseball**
*doing business as*
Major League Baseball          represented by  **Elise Michelle Bloom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Samson Fox**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Diamant Kaufman**
(See above for address)
*TERMINATED: 05/09/2014*
*LEAD ATTORNEY*

**Mark W. Batten**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**                                        represented by

**Major League Baseball Enterprises, Inc.**
*TERMINATED: 10/02/2013*

**Elise Michelle Bloom**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joshua Samson Fox**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth Diamant Kaufman**
(See above for address)
*TERMINATED: 05/09/2014*
*LEAD ATTORNEY*

**Mark W. Batten**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/07/2013 | 1 | COMPLAINT against Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Filing Fee $ 350.00, Receipt Number 1073827)Document filed by John Chen.(laq) (Entered: 08/08/2013) |
| 08/07/2013 | | SUMMONS ISSUED as to Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (laq) (Entered: 08/08/2013) |
| 08/07/2013 | | Magistrate Judge Debra C. Freeman is so designated. (laq) (Entered: 08/08/2013) |
| 08/07/2013 | | Case Designated ECF. (laq) (Entered: 08/08/2013) |
| 08/15/2013 | 2 | MOTION to Certify Class *Notice of Motion for Court−Authorized Notice*. Document filed by John Chen.(Swartz, Justin) (Entered: 08/15/2013) |
| 08/15/2013 | 3 | MEMORANDUM OF LAW in Support re: 2 MOTION to Certify Class *Notice of Motion for Court−Authorized Notice*.. Document filed by John Chen. (Swartz, Justin) (Entered: 08/15/2013) |
| 08/15/2013 | 4 | DECLARATION of Justin M. Swartz in Support re: 2 MOTION to Certify Class *Notice of Motion for Court−Authorized Notice*.. Document filed by John Chen. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Swartz, Justin) (Entered: 08/15/2013) |
| 08/15/2013 | 5 | DECLARATION of John Chen in Support re: 2 MOTION to Certify Class *Notice of Motion for Court−Authorized Notice*.. Document filed by John Chen. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Swartz, Justin) (Entered: 08/15/2013) |
| 08/23/2013 | 6 | NOTICE OF COURT CONFERENCE: You are directed to appear for a pretrial conference, to be held on Monday, October 7, 2013, in Courtroom 12B, at 4:30pm in front of the Honorable John G. Koeltl. All requests for adjournments must be made in writing to the Court. For any further information, please contact the Court at (212) 805−0107. Pretrial Conference set for 10/7/2013 at 04:30 PM in Courtroom 12B, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. Don Fletcher, Courtroom Case Manager, Dated: August 23, 2013. (djc) Modified on 8/23/2013 (djc). (Entered: 08/23/2013) |
| 08/28/2013 | 7 | NOTICE OF APPEARANCE by Elise Michelle Bloom on behalf of Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Bloom, Elise) (Entered: 08/28/2013) |


| | | |
|---|---|---|
| 08/28/2013 | 8 | NOTICE OF APPEARANCE by Joshua Samson Fox on behalf of Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Fox, Joshua) (Entered: 08/28/2013) |
| 09/04/2013 | 9 | MOTION for Mark W. Batten to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208−8840718. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball.(Batten, Mark) (Entered: 09/04/2013) |
| 09/05/2013 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 9 MOTION for Mark W. Batten to Appear Pro Hac Vice. Filing fee $ 200.00, receipt number 0208−8840718. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu) (Entered: 09/05/2013)** |
| 09/09/2013 | 10 | ORDER FOR ADMISSION PRO HAC VICE granting 9 Motion for Mark W. Batten to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 9/7/2013) (tro) (Entered: 09/09/2013) |
| 09/17/2013 | 11 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent Major League Baseball Enterprises, Inc for Major League Baseball Properties, Inc.. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball.(Bloom, Elise) (Entered: 09/17/2013) |
| 09/19/2013 | 12 | STIPULATION EXTENDING TIME: IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for the parties, subject to the Court's approval, that Defendants will have until October 31, 2013, or another date set by the Court, to file its opposition to Plaintiff's Motion for Court−Authorized Notice, which was filed on August 15, 2013. (Signed by Judge John G. Koeltl on 9/18/2013) (djc) (Entered: 09/19/2013) |
| 09/19/2013 | | Set/Reset Deadlines: Responses due by 10/31/2013 (djc) (Entered: 09/23/2013) |
| 09/30/2013 | 13 | WAIVER OF SERVICE RETURNED EXECUTED. Major League Baseball Properties, Inc. waiver sent on 9/3/2013, answer due 11/4/2013. Document filed by John Chen. (Swartz, Justin) (Entered: 09/30/2013) |
| 09/30/2013 | 14 | WAIVER OF SERVICE RETURNED EXECUTED. Major League Baseball Enterprises, Inc. waiver sent on 9/3/2013, answer due 11/4/2013. Document filed by John Chen. (Swartz, Justin) (Entered: 09/30/2013) |
| 09/30/2013 | 15 | WAIVER OF SERVICE RETURNED EXECUTED. Major League Baseball waiver sent on 9/3/2013, answer due 11/4/2013. Document filed by John Chen. (Swartz, Justin) (Entered: 09/30/2013) |
| 09/30/2013 | 16 | WAIVER OF SERVICE RETURNED EXECUTED. The Office of the Commissioner of Baseball waiver sent on 9/3/2013, answer due 11/4/2013. Document filed by John Chen. (Swartz, Justin) (Entered: 09/30/2013) |
| 10/01/2013 | 17 | NOTICE OF APPEARANCE by Seth Diamant Kaufman on behalf of Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Kaufman, Seth) (Entered: 10/01/2013) |
| 10/01/2013 | 18 | LETTER MOTION for Conference *to request a pre−motion conference in anticipation of filing a motion to dismiss pursuant to FRCP 12(b)(6)* addressed to Judge John G. Koeltl from Elise M. Bloom dated 10/1/2013. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball.(Bloom, Elise) (Entered: 10/01/2013) |
| 10/02/2013 | 19 | STIPULATION AND PROPOSED ORDER FOR DISMISSAL OF CERTAIN DEFENDANTS AND REVISION OF CAPTION: IT IS HEREBY STIPULATED AND AGREED, by and between counsel for Plaintiff and counsel for Defendants, as follows: (1) all claims presented in the Complaint in the above−entitled action |

| | | |
|---|---|---|
| | | shall be dismissed without prejudice and without costs as to Defendants Major League Baseball and Major League Baseball Enterprises, Inc. (the "Dismissed Defendants"); (2) this stipulation shall not bar Plaintiff from moving to amend the Complaint to add the Dismissed Defendants as parties should Plaintiff choose to do so during or after discovery; Defendants, including the Dismissed Defendants, retain all rights to oppose said motion except for on the grounds set forth in paragraph (4) below;(3) if Plaintiff does elect to add the Dismissed Defendants as parties, (a) the statutes of limitations for all claims against the Dismissed Defendants shall be tolled as of the filing of the original complaint in this matter to the same extent that the original complaint tolled them; (4) this amendment shall not constitute Plaintiff s one amendment as of right pursuant to Fed. R. Civ. P. 15(a)(l); (5) the caption of the above matter will be revised so that Dismissed Defendants are deleted and Major League Baseball Properties, Inc. and The Office of the Commissioner of Baseball d/b/a Major League Baseball are listed as the only defendants. (Signed by Judge John G. Koeltl on 10/2/2013) (djc) Modified on 10/2/2013 (djc). (Entered: 10/02/2013) |
| 10/04/2013 | 20 | LETTER RESPONSE to Motion addressed to Judge John G. Koeltl from Justin M. Swartz dated October 4, 2013 re: 18 LETTER MOTION for Conference *to request a pre−motion conference in anticipation of filing a motion to dismiss pursuant to FRCP 12(b)(6)* addressed to Judge John G. Koeltl from Elise M. Bloom dated 10/1/2013. LETTER MOTION for Conference *to request a pre−motion conference in anticipation of filing a motion to dismiss pursuant to FRCP 12(b)(6)* addressed to Judge John G. Koeltl from Elise M. Bloom dated 10/1/2013.. Document filed by John Chen. (Swartz, Justin) (Entered: 10/04/2013) |
| 10/07/2013 | | Minute Entry for proceedings held before Judge John G. Koeltl: Interim Pretrial Conference held on 10/7/2013. (sc) (Entered: 11/04/2013) |
| 10/16/2013 | 21 | LETTER addressed to Judge John G. Koeltl from Elise M. Bloom dated October 15, 2013 re: Scheduling. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball.(Bloom, Elise) (Entered: 10/16/2013) |
| 10/17/2013 | 22 | MEMO ENDORSEMENT on re: 21 Letter, filed by Major League Baseball, Major League Baseball Properties, Inc., Major League Baseball Enterprises, Inc. The Office of the Commissioner of Baseball. APPLICATION GRANTED. ( Motions due by 11/4/2013. Responses due by 11/25/2013. Replies due by 12/16/2013.) (Signed by Judge John G. Koeltl on 10/17/2013) (djc) (Entered: 10/17/2013) |
| 11/04/2013 | 23 | MOTION to Dismiss. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball.(Bloom, Elise) (Entered: 11/04/2013) |
| 11/04/2013 | 24 | MEMORANDUM OF LAW in Support re: 23 MOTION to Dismiss.. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Bloom, Elise) (Entered: 11/04/2013) |
| 11/04/2013 | 25 | DECLARATION of Elise M. Bloom Esq. in Support re: 23 MOTION to Dismiss.. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Bloom, Elise) (Entered: 11/04/2013) |
| 11/21/2013 | 26 | MEMORANDUM OF LAW in Opposition re: 2 MOTION to Certify Class *Notice of Motion for Court−Authorized Notice. Defendants' Opposition to Plaintiff's otion for Court Authorized Notice.* Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Bloom, Elise) (Entered: 11/21/2013) |
| 11/21/2013 | 27 | DECLARATION of Marla Miller in Opposition re: 2 MOTION to Certify Class *Notice of Motion for Court−Authorized Notice.*. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Attachments: # 1 Exhibit A)(Bloom, Elise) (Entered: 11/21/2013) |

| | | |
|---|---|---|
| 11/25/2013 | 28 | LETTER addressed to Judge John G. Koeltl from Justin M. Swartz dated 11/25/2013 re: Plaintiff's Request That the Court Deny Defendant's Motion to Dismiss as Moot in Light of Plaintiff's First Amended Complaint. Document filed by John Chen.(Swartz, Justin) (Entered: 11/25/2013) |
| 11/25/2013 | 29 | FIRST AMENDED COMPLAINT amending 1 Complaint against Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball with JURY DEMAND.Document filed by John Chen. Related document: 1 Complaint filed by John Chen.(ja) (Entered: 11/26/2013) |
| 11/27/2013 | 30 | NOTICE OF COURT CONFERENCE: You are directed to appear for a pretrial conference, to be held on Friday, December 13,2013 in Courtroom 12B, at 2:30 pm in front of the Honorable John G. Koeltl Pretrial Conference set for 12/13/2013 at 02:30 PM in Courtroom 12B, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (js) (Entered: 12/02/2013) |
| 12/03/2013 | 31 | LETTER addressed to Judge John G. Koeltl from Elise M. Bloom dated 12/3/2013 re: Plaintiff's Request That the Court Deny Defendant's Motion to Dismiss as Moot in Light of Plaintiff's First Amended Complaint. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball.(Bloom, Elise) (Entered: 12/03/2013) |
| 12/04/2013 | 32 | MEMO ENDORSEMENT on re: 31 Letter, filed by Major League Baseball, Major League Baseball Properties, Inc., Major League Baseball Enterprises, Inc., The Office of the Commissioner of Baseball. ENDORSEMENT: 1. The pending motion to dismiss is denied without prejudice as moot. 2. The defendants may move to dismiss the amended complaint by Dec. 12, 2013. 3. The Clerk is directed to close docket Nos. 18 and 23... 18 LETTER MOTION for Conference *to request a pre–motion conference in anticipation of filing a motion to dismiss pursuant to FRCP 12(b)(6)* addressed to Judge John G. Koeltl from Elise M. Bloom dated 10/1/2013. LETTER MOTION for Conference *to request a pre–motion conference in anticipation of filing a motion to dismiss pursuant to FRCP 12(b)(6)* addressed to Judge John G. Koeltl from Elise M. Bloom dated 10/1/2013. filed by Major League Baseball, Major League Baseball Properties, Inc., Major League Baseball Enterprises, Inc., The Office of the Commissioner of Baseball., 23 MOTION to Dismiss. filed by Major League Baseball, Major League Baseball Properties, Inc., Major League Baseball Enterprises, Inc., The Office of the Commissioner of Baseball., ( Motions due by 12/12/2013.) (Signed by Judge John G. Koeltl on 12/4/2013) (lmb) (Entered: 12/04/2013) |
| 12/05/2013 | 33 | JOINT LETTER MOTION for Extension of Time to Amend *Briefing Schedule for Plaintiff's Motion for Court–Authorized Notice and Defendants' Renewed Motion to Dismiss* addressed to Judge John G. Koeltl from Justin M. Swartz dated December 5, 2013. Document filed by John Chen, Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball.(Swartz, Justin) (Entered: 12/05/2013) |
| 12/09/2013 | 34 | ORDER: granting 33 Letter Motion for Extension of Time to Amend. APPLICATION GRANTED. (Signed by Judge John G. Koeltl on 12/9/2013) (djc) (Entered: 12/09/2013) |
| 12/09/2013 | | Set/Reset Deadlines: Motions due by 12/20/2013. Responses due by 1/14/2014. Replies due by 2/4/2014. (djc) (Entered: 12/09/2013) |
| 12/20/2013 | 35 | MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint.* Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball.(Bloom, Elise) (Entered: 12/20/2013) |
| 12/20/2013 | 36 | MEMORANDUM OF LAW in Support re: 35 MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint.* MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint..* Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Bloom, Elise) (Entered: 12/20/2013) |

| | | |
|---|---|---|
| 12/20/2013 | 37 | FILING ERROR − DUPLICATE DOCKET ENTRY − DECLARATION of Elise M. Bloom, Esq. in Support re: 35 MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint*. MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint*.. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Bloom, Elise) Modified on 12/20/2013 (db). (Entered: 12/20/2013) |
| 12/20/2013 | 38 | DECLARATION of Elise M. Bloom, Esq. in Support re: 35 MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint*. MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint*.. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Bloom, Elise) (Entered: 12/20/2013) |
| 12/20/2013 | 39 | REPLY MEMORANDUM OF LAW in Support re: 2 MOTION to Certify Class *Notice of Motion for Court−Authorized Notice*.. Document filed by John Chen. (Swartz, Justin) (Entered: 12/20/2013) |
| 01/14/2014 | 40 | MEMORANDUM OF LAW in Opposition re: 35 MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint*. MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint*.. Document filed by John Chen. (Swartz, Justin) (Entered: 01/14/2014) |
| 02/04/2014 | 41 | REPLY MEMORANDUM OF LAW in Support re: 35 MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint*. MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint*.. Document filed by Major League Baseball, Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Bloom, Elise) (Entered: 02/04/2014) |
| 03/05/2014 | 42 | NOTICE OF ORAL ARGUMENT: You are directed to appear for oral argument on the pending motion( s), to be held on Friday, March 14, 2014 at 2:30 pm, in Courtroom 12B, in front of the Honorable John G. Koeltl. Oral Argument set for 3/14/2014 at 02:30 PM in Courtroom 12B, 500 Pearl Street, New York, NY 10007 before Judge John G. Koeltl. (ama) (Entered: 03/05/2014) |
| 03/14/2014 | | Minute Entry for proceedings held before Judge John G. Koeltl: Oral Argument held on 3/14/2014 re: 35 MOTION to Dismiss. 2 MOTION to Certify Class.(Fletcher, Donnie) (Entered: 04/14/2014) |
| 03/25/2014 | 51 | INTERNET CITATION NOTE: Material from decision with Internet citation re: 43 Memorandum &Opinion. (fk) (Entered: 06/09/2014) |
| 03/26/2014 | 43 | OPINION AND ORDER 104116 granting 35 MOTION to Dismiss *Notice of Defendants' Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint*. MOTION to Dismiss *Notice of Defendants'Renewed 12(b)(6) Motion to Dismiss Plaintiff's First Amended Complaint* filed by Major League Baseball, Major League Baseball Properties, Inc., Major League Baseball Enterprises, Inc., The Office of the Commissioner of Baseball, denying 2 MOTION to Certify Class *Notice of Motion for Court−Authorized Notice* filed by John Chen. The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. For the foregoing reasons, the defendants' motion to dismiss the FLSA claims is granted. The plaintiffs New York state−law claims are dismissed without prejudice. The plaintiffs motion for collective action and court−authorized notice is denied as moot. The Clerk is directed to close Docket Nos. 2 and 35, to enter judgment, and to close this case. SO ORDERED. (Signed by Judge John G. Koeltl on 3/25/2014) (ft) Modified on 3/28/2014 (nt). (Entered: 03/26/2014) |


| 03/26/2014 | | Transmission to Judgments and Orders Clerk. Transmitted re: 43 Memorandum & Opinion to the Judgments and Orders Clerk. (ft) (Entered: 03/26/2014) |
|---|---|---|
| 03/27/2014 | 44 | TRANSCRIPT of Proceedings re: ARGUMENT held on 3/14/2014 before Judge John G. Koeltl. Court Reporter/Transcriber: Martha Drevis, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/21/2014. Redacted Transcript Deadline set for 5/1/2014. Release of Transcript Restriction set for 6/30/2014.(Rodriguez, Somari) (Entered: 03/27/2014) |
| 03/27/2014 | 45 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a ARGUMENT proceeding held on 3/14/14 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(Rodriguez, Somari) (Entered: 03/27/2014) |
| 03/31/2014 | 46 | JUDGMENT: It is ORDERED, ADJUDGED AND DECREED: that for the reasons stated in the Court's Opinion and Order, dated March 26, 2014, Defendants' motion to dismiss the FLSA claims is granted; plaintiff's New York state−law claims are dismissed without prejudice; and plaintiff's motion for collective certification and court−authorized notice is denied as moot; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 3/31/2014) (Attachments: # 1 Right to Appeal) (tn) (Entered: 03/31/2014) |
| 04/23/2014 | 47 | NOTICE OF APPEAL from 46 Clerk's Judgment,, 43 Memorandum & Opinion,,,,, Document filed by John Chen. Filing fee $ 505.00, receipt number 0208−9591944. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Swartz, Justin) (Entered: 04/23/2014) |
| 04/23/2014 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 47 Notice of Appeal,. (nd) (Entered: 04/23/2014) |
| 04/23/2014 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 47 Notice of Appeal, filed by John Chen were transmitted to the U.S. Court of Appeals. (nd) (Entered: 04/23/2014) |
| 05/08/2014 | 48 | NOTICE of Withdrawal. Document filed by Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. (Kaufman, Seth) (Entered: 05/08/2014) |
| 05/08/2014 | 49 | LETTER addressed to Judge John G. Koeltl from Seth D. Kaufman, Esq. dated 05/08/2014 re: Withdrawing my Appearance on behalf of Defendant's Major League Baseball Properties, Inc., and The Office of the Commissioner of Baseball. Document filed by Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball.(Kaufman, Seth) (Entered: 05/08/2014) |
| 05/09/2014 | 50 | MEMO ENDORSEMENT on re: 49 Letter, filed by Major League Baseball Properties, Inc., The Office of the Commissioner of Baseball. ENDORSEMENT: SO ORDERED (Signed by Judge John G. Koeltl on 5/9/2014) (kgo) (Entered: 05/09/2014) |

**OUTTEN & GOLDEN LLP**
Justin M. Swartz
Juno Turner
Michael N. Litrownik
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: 212-245-1000



### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN CHEN, on behalf of himself and all others similarly situated, | **No. 13 Civ. 5494 (JGK)** |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| MAJOR LEAGUE BASEBALL PROPERTIES, INC. and THE OFFICE OF THE COMMISSIONER OF BASEBALL, d/b/a/ MAJOR LEAGUE BASEBALL. | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff John Chen ("Plaintiff"), individually and as a class representative on behalf of all others similarly situated, by his attorneys Outten & Golden LLP, makes the following allegations against Defendants Major League Baseball Properties, Inc. and The Office of the Commissioner of Baseball, d/b/a/ Major League Baseball (collectively, "MLB"):

### INTRODUCTION

1.    MLB staffed its baseball operations throughout the year, including regular-season and post-season baseball games at various ballparks throughout the country, and events connected to its All-Star Week festivities, with "volunteers,"[1] and did not pay them any wages.

---

[1]    By using the term "volunteer" throughout this First Amended Class Action Complaint, the term that MLB used to describe the workers in question, Plaintiff does not concede that Plaintiff or any other "volunteers" had no expectation of compensation. To the contrary, as pled in paragraphs 39-40, 91-92, and 100-03 herein, MLB promised, and the "volunteers" expected, compensation in the form of free admission to events and other items of value.

2.      For example, MLB staffed events during All-Star Week, including All-Star FanFest ("FanFest"), a lucrative, for-profit commercial operation that MLB promoted as "the largest interactive baseball theme park in the world," and described as "baseball heaven on earth,"[2] almost entirely with unpaid volunteers.

3.      In addition to FanFest, MLB recruited volunteers to perform work and service MLB customers at numerous other events at various locations throughout New York City and other All Star host cities, including a 5K race, a concert, a fantasy camp, and a parade.  These volunteers were categorized as Hospitality Volunteers, Hotel Volunteers, Ticket Takers & Greeters, Transportation Volunteers, and Greeters & Starters and all performed valuable productive work for MLB.

4.      In 2013, through its website, MLB recruited approximately 2000 volunteers to "represent New York by welcoming . . . guests [in other words, paying customers] from around the world and assisting in the smooth operations of all of the [All-Star] events."[3]

5.      MLB began recruiting volunteers for the July 2013 All Star Week events as early as October of 2012.[4]

6.      Instead of paying volunteers cash wages for their work, MLB, the world's preeminent professional baseball league with annual revenue of more than seven billion dollars, provided these volunteers with, among other things, a "a shirt, a cap and a cinch drawstring

---

[2]      See "*MLB FanFest Touted As 'Baseball Heaven on Earth,'*" CBS New York, July 10, 2013, available at http://newyork.cbslocal.com/2013/07/10/mlb-fanfest-touted-as-baseball-heaven-on-earth (last visited November 25, 2013).

[3]      See http://mlb.mlb.com/mlb/events/all_star/y2013/fanfest/faq.jsp (last visited November 25, 2013).

[4]      See http://mlb.mlb.com/news/article.jsp?ymd=20121004&content_id=39481012&vkey=pr_mlb&c_id=mlb (last visited November 25, 2013).

2

backpack," free admission for the volunteer and one guest to FanFest, a water bottle, a baseball, and a lanyard.

7.      In addition to All Star Week events, MLB also recruited and staffed unpaid workers as garbage collectors at ballparks throughout the country, calling them "Green Team" volunteers and assigning them duties including collecting used beer cups and other recyclable used food containers from fans, and otherwise assisting MLB in its garbage disposal and recycling work at ballparks.  MLB used unpaid volunteers for this purpose during the World Series and throughout the regular baseball season.[5]

8.      In exchange for this work, Green Team "volunteers" received free admission to games and t-shirts but no cash wages.

9.      Through this action, Plaintiff seeks to (1) force MLB to stop soliciting and accepting work from unpaid volunteers, (2) allow those who cannot afford to work for free to work for MLB at FanFest and other events throughout the year; and (3) recover unpaid wages for all unpaid volunteers who performed work for MLB during the relevant period.

10.      MLB's failure to pay its volunteers any wages violated federal and state minimum wage laws, which require employers to pay at least the minimum wage for all work that they "suffer or permit," and which exist to eliminate "labor conditions detrimental to the maintenance

---

[5]      *See* http://web.mlbcommunity.org/media/video.jsp?content_id=25547019&topic_id=24397710 (video describing how "MLB.com supports the Going Green initiative as volunteers assist in recycling efforts at ballparks during the 2012 World Series") (last visited November 25, 2013); http://www.mlb.com/photos/gallery.jsp?content_id=40594968&c_id=mlb (photo gallery of "Green Team" volunteers collecting recyclables from fans) (last visited November 25, 2013); http://switchboard.nrdc.org/blogs/ahenly/st_louis_cardinals_and_texas_rangers.html ("During the first four games of the 2011 World Series, Major League Baseball worked with the Cardinals and Rangers to coordinate over 225 Green Team volunteers throughout their ballparks to help reduce the environmental footprint of the World Series games.") (last visited November 25, 2013).

of the minimum standard of living necessary for health, efficiency, and general well-being of workers."[6]

11.    By failing to pay Plaintiff and thousands of others for their productive work, MLB denied federal, state, and local governments significant tax revenue and denied the volunteers important benefits of working, including workers' compensation insurance, social security contributions, and, most importantly, the ability to earn a fair day's wage for a fair day's work.

12.    MLB also excluded New Yorkers and many others who could not afford to work for free.

13.    Unpaid private-sector jobs damage the labor market and are a detriment to society.[7] As for-profit companies hire more unpaid workers, they hire fewer paid workers, especially entry-level workers.[8] Reliance on unpaid labor leads to "an ideal system for perpetuating and increasing inequality" among the economically advantaged and disadvantaged jobseekers.[9]

14.    Unpaid jobs "depress[] wages by creating an oversupply of people willing to work not just for low wages, but literally for nothing." They also "undermine the meritocracy that

---

[6]    *See* 29 U.S.C. § 202, 203(g); N.Y. Lab. Law § 2(7); *Glatt v. Fox Searchlight Pictures, Inc.*, No. 11 Civ. 6784, 2013 WL 2495140 (S.D.N.Y. June 11, 2013) (unpaid interns are "employees" and entitled to minimum wage under the Fair Labor Standards Act where they provide an immediate advantage to their employer performing low-level tasks that do not require specialized training and they receive nothing approximating the education they would receive in an academic setting).

[7]    *See, e.g.*, Ross Perlin, INTERN NATION: HOW TO EARN NOTHING AND LEARN LITTLE IN THE BRAVE NEW ECONOMY, Verso Publishers (2012).

[8]    *See* David L. Gregory, *The Problematic Employment Dynamics of Student Internships*, 12 Notre Dame J.L. Ethics & Pub. Pol'y 227, 242 (1998).

[9]    Daniel Akst, Op-Ed., *Unpaid Internships? File Under "Hypocrisy,"* L.A. Times, Jun. 15, 2010, at A15, available at http://articles.latimes.com/2010/jun/15/opinion/la-oe-akst-internships-20100615.

allocates jobs and rewards people for their skills and gumption."[10]

15.     MLB could have easily afforded to pay all of its "volunteers."

16.     For example, MLB charged adults $35.00 and children two years and older

$30.00 to enter FanFest.[11]

17.     Upon entering FanFest, paying customers could purchase a small bag of potato

chips for $5.00 and a cup of lemonade for $7.50.[12]

18.     Thousands of adults and children attended FanFest between July 12 and July 16,

2013, and, upon information and belief, spent hundreds of thousands of dollars there.

19.     Major League Baseball Properties' Corporate Sales & Marketing department

solicited lucrative corporate sponsorships by claiming that "Baseball fans of all ages are

expected to attend 2013 MLB All-Star FanFest, and your organization will have the ideal venue

to leverage the most eagerly awaited fan experience of the summer."[13]

20.     Events during the 2013 All-Star Week were sponsored by large corporations

including T-Mobile, Taco Bell, SiriusXM, Gatorade, Majestic, Blockbuster, Kellogg's, Gillette,

Head & Shoulders, One A Day, Firestone, Scotts, Chevy, Duane Reade, New Era, Budweiser,

Party City, and Under Armour, among others.

21.     These corporate sponsorships earned MLB significant revenue.

22.     According to MLB, the 2013 All-Star Game and related events, including

---

[10]     *See* Ross Eisenbrey, Economic Policy Institute, http://www.epi.org/blog/unpaid-internships-scourge-labor-market/ (last visited November 25, 2013).

[11]     *See* http://mlb.mlb.com/mlb/downloads/y2013/fanfest_brochure.pdf (last visited November 25, 2013).

[12]     *See "All-Star Festival Fleeces Fans,"* New York Post, July 21, 2013, available at http://www.nypost.com/p/sports/more_sports/pay_to_play_U5lJnqtgFCPx9dvH2WJRyJ (last visited November 25, 2013).

[13]     *See* http://mlb.mlb.com/mlb/events/all_star/y2013/fanfest/fanfest_sponsorship.jsp (last visited November 25, 2013).

FanFest, brought approximately $191.5 million into the New York City economy.[14]

23.     None of these millions of dollars, however, ended up in the pockets of the New Yorkers whom MLB recruited to provide the labor necessary to prepare for and run FanFest and other All-Star Week events.

24.     In addition to FanFest, MLB used unpaid volunteers before and during All Star Week to serve as pre-game rehearsal stand-ins, prepare welcome baskets, assist with deliveries and similar behind-the-scenes tasks, assist with fantasy camps, set up parade floats, paint murals, greet and direct fans, hand out gift bags, and assist with transportation.

25.     MLB used unpaid volunteers to stand in Flushing Meadow Park near Citi Field and direct customers to the subway and commuter trains and to dress up like veterans and professional baseball players at Citi Field during All Star Week events to entertain the paying customers in the crowd.

26.     MLB also used volunteers to provide information to customers at numerous sites all around New York City, including but not limited to the Roosevelt Hotel, Affinia Shelburne, and other hotels.

27.     At FanFest, MLB used volunteers to operate the 40 attractions[15] that were "included with the price of admission."[16]

28.     Prior to All Star Week, MLB required volunteers to attend an unpaid mandatory

---

[14]     *See*
http://minnesota.twins.mlb.com/news/article.jsp?ymd=20130730&content_id=55250430&vkey=news_min&c_id=min (last visited November 25, 2013).
[15]     *See* http://newyork.cbslocal.com/2013/07/10/mlb-fanfest-touted-as-baseball-heaven-on-earth/ (last visited November 25, 2013);
http://mlb.mlb.com/mlb/downloads/y2013/fanfest_map.pdf (last visited November 25, 2013).
[16]     *See* http://mlb.mlb.com/mlb/downloads/y2013/fanfest_brochure.pdf (last visited November 25, 2013).

information session and an unpaid mandatory orientation session.

29.    In an email to Plaintiff and other volunteers, MLB told volunteers that they were "cordially invited to attend our mandatory orientation."

30.    If volunteers were unable to attend the unpaid mandatory orientation, they were not allowed to work at FanFest or other events.[17]

31.    MLB did not provide All-Star Game tickets to FanFest volunteers, although it gave its more than 2000 volunteers the chance to win *one pair* of All-Star Game tickets, but only if they worked "three shifts at any of the All-Star events."[18]

32.    Instead, MLB allowed volunteers the opportunity to "experience All-Star Week" at FanFest at times that they were "not required to work."[19]

33.    MLB refused to pay for volunteers' parking or transportation.[20]

34.    MLB also held its All-Star FanFest and related All-Star Game events in New York, New York in 2008 and staffed them with unpaid volunteers.[21]

35.    2008 volunteers were required to "attend at least one orientation session pertaining to the event(s) for which they were assigned to (sic.)."[22]

36.    The work that 2008 volunteers performed included work at the DHL All-Star

---

[17]    *See* http://mlb.mlb.com/mlb/events/all_star/y2013/fanfest/faq.jsp (last visited November 25, 2013).
[18]    *See* http://mlb.mlb.com/mlb/events/all_star/y2013/fanfest/faq.jsp (last visited November 25, 2013).
[19]    *See* http://mlb.mlb.com/mlb/events/all_star/y2013/fanfest/faq.jsp (last visited November 25, 2013).
[20]    *See* http://mlb.mlb.com/mlb/events/all_star/y2013/fanfest/faq.jsp (last visited November 25, 2013).
[21]    *See* http://newyork.yankees.mlb.com/nyy/fan_forum/asg/volunteers_form.jsp (last visited November 25, 2013).
[22]    *See* http://newyork.yankees.mlb.com/nyy/fan_forum/asg/volunteers_form.jsp (last visited November 25, 2013).

FanFest, greeters, hospitality, office/clerical, information booth, event logistics and transportation."[23]

37.     MLB required volunteers at the 2008 FanFest to work "a minimum of three shifts (approximately 4 hours each)."[24]

38.     MLB also assigned 2008 All-Star volunteers to perform work outside of FanFest, including assisting All-Star customers in locating the shuttle buses to Yankee Stadium and providing customers with information about transportation to the Home Run Derby at Yankee Stadium.  Volunteers performed this work from hotels across New York City.

39.     As compensation for their work, 2008 All-Star volunteers were promised and received a fanny pack, a baseball, and two free admission tickets to FanFest.

40.     MLB held its All-Star Game and related events in Phoenix, Arizona in 2011,[25] and in Kansas City, Missouri in 2012.  MLB staffed each of these All-Star FanFests and related events with unpaid volunteers under similar circumstances to the 2008 and 2013 events.[26] Volunteers in 2011 and 2012 were promised and received valuable compensation similar to the compensation received by 2008 and 2013 volunteers.

41.     MLB required all of its unpaid volunteers between 2008 and 2013 to pass background checks.

---

[23]     *See* http://newyork.yankees.mlb.com/nyy/fan_forum/asg/volunteers_form.jsp (last visited November 25, 2013).
[24]     *See* http://newyork.yankees.mlb.com/nyy/fan_forum/asg/volunteers_form.jsp (last visited November 25, 2013).
[25]     *See* http://mlb.mlb.com/mlb/events/all_star/y2011/fanfest_tickets.jsp (last visited November 25, 2013).
[26]     *See* http://newyork.yankees.mlb.com/nyy/fan_forum/asg/volunteers_form.jsp (2008, New York, NY) (last visited November 25, 2013); https://secure.mlb.com/mlb/events/all_star/y2011/volunteer_form.jsp (2012, Kansas City, MO) (last visited November 25, 2013).

42.     Upon information and belief, MLB also intends to staff future regular season and post-season baseball events with unpaid "Green Team" volunteers.

43.     MLB intends to repeat its unlawful practice by staffing future FanFests and other All Star Week events with unpaid volunteers and staffing regular and post-season baseball games with "Green Team" volunteers.

44.     MLB plans to hold its 2014 All-Star Game in Minneapolis, MN.

45.     Having identified a free workforce, MLB has invited 2013 unpaid volunteers to work for free at the 2014 All-Star events, including the 2014 All-Star FanFest.[27]

46.     More than 300 volunteers worked for MLB in multiple All-Star cities.

47.     Plaintiff brings this action on behalf of himself and those similarly situated who elect to opt-in to this action pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and specifically, the collective action provision of 29 U.S.C. § 216(b), to remedy MLB's violations of the wage-and-hour provisions of the FLSA that have deprived Plaintiff and others similarly situated of their lawfully earned wages.

48.     Plaintiff also brings individual and representative wage claims under the New York Labor Law Art. 6, §§ 190 *et seq.*, Art. 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations, N.Y. Comp. Codes R. & Regs. tit. 12, Part 142 *et seq.* (collectively, "NYLL") as a class action pursuant to Fed. R. Civ. P. 23.

---

[27]     *See*
http://mlb.mlb.com/news/article.jsp?ymd=20130730&content_id=55250430&vkey=news_mlb&c_id=mlb (last visited November 25, 2013);
http://mlb.mlb.com/min/ticketing/sth/gen/allstar_faq.jsp (last visited November 25, 2013).

## THE PARTIES

**Plaintiff**

49.     Plaintiff John Chen is an adult individual who resides in Rego Park, New York.

50.     Plaintiff worked for MLB at FanFest as an unpaid volunteer on June 1, 2013 and July 10, 12, 13, and 16, 2013.

51.     MLB did not pay Chen any wages.

52.     Chen is a covered employee within the meaning of the FLSA and the NYLL.

53.     Chen has consented to join this action by filing a written Consent to Join form.


**Defendants**

54.     Defendant The Office of the Commissioner of Baseball is an unincorporated association also doing business as Major League Baseball.

55.     The Office of the Commissioner of Baseball has as its members the Major League Baseball Clubs and has as it agent corporation Defendant Major League Baseball Properties, Inc.

56.     Defendants are part of a single integrated enterprise that jointly employed Plaintiff and similarly situated "volunteers" at all times relevant.

57.     Defendants' operations are interrelated and unified.

58.     During all relevant times, Defendants centrally controlled the labor relations of all events for which "volunteers" worked.

59.     During all relevant times, Defendants exercised operational control over "volunteers," including, but not limited to, control over: compensation; recruiting and training of workers; recruiting and training of "volunteer" supervisors; sales and marketing programs; public relations programs; promotional services; advertising campaigns; hospitality training;

appearance and conduct standards for workers; and inventory controls.

60.     MLB employed Plaintiff and similarly situated volunteers.

61.     Each year, MLB organizes and puts on an All-Star Game that includes the top players in each league.

62.     The All-Star Game is preceded by four days of events, including FanFest, staffed largely by unpaid volunteers.

63.     MLB created the "Green Team" program and recruits and manages "Green Team" unpaid volunteers.

64.     Throughout the relevant period, MLB maintained control, oversight, and direction over Plaintiff and similarly situated employees, including with respect to hiring and other employment practices that applied to unpaid volunteers.

65.     The All-Star Game and surrounding events, including FanFest, were under the supervision, control, and direction of MLB.

66.     MLB has applied the same employment policies, practices, and procedures, including hiring criteria and failure to pay wages, to all unpaid volunteers who work for MLB over All-Star Week.

67.     MLB has applied the same relevant employment policies, practices, and procedures, including hiring criteria and failure to pay wages, to all unpaid volunteers who work for MLB throughout the year.

68.     MLB is a covered employer within the meaning of the FLSA and the NYLL and, at all relevant times, employed and/or jointly employed Plaintiff and similarly situated employees.

## JURISDICTION AND VENUE

69.     This Court has subject matter jurisdiction with respect to Plaintiff's federal claims

pursuant to 28 U.S.C. §§ 1331 and 1337, and jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

70.     Plaintiff's state law claims are so closely related to Plaintiff's claims under the

Fair Labor Standards Act that they form part of the same case or controversy under Article III of

the United States Constitution.

71.     This Court also has jurisdiction over Plaintiff's claims under the FLSA pursuant

to 29 U.S.C. § 216(b).

72.     Upon information and belief, there are more than 100 members of the proposed

class in the aggregate.

73.     MLB is subject to personal jurisdiction in New York.

74.     MLB maintains an office at 245 Park Avenue, New York, New York.

75.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C.

§§ 2201 and 2202.

76.     Venue is proper in the Southern District of New York pursuant to

28 U.S.C. § 1391(b) and (c) because MLB is subject to personal jurisdiction in the Southern

District of New York and a substantial part of the events or omissions giving rise to the claims

occurred in this District.

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs bring the Third, Fourth, and Fifth Causes of Action, NYLL claims,

under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all persons

who have worked as unpaid volunteers for MLB in New York between August 7, 2007 and the

date of final judgment in this matter (the "Volunteer Class"). The Volunteer Class includes all

unpaid volunteers who worked at the 2008 FanFest and other 2008 All-Star Game events, the

2013 FanFest and other 2013 All-Star Game events, as "Green Team" unpaid volunteers, and at

all other MLB activities, including events run by the New York Yankees and the New York Mets

since August 7, 2007.

78.     Excluded from the Volunteer Class are MLB, MLB's legal representatives,

officers, directors, assigns, and successors, or any individual who has, or who at any time during

the class period has had, a controlling interest in MLB; the Judge(s) to whom this case is

assigned and any member of the Judges' immediate family; and all persons who will submit

timely and otherwise proper requests for exclusion from the Volunteer Class.

79.     The members of the Volunteer Class are so numerous that joinder of all members

is impracticable.

80.     Upon information and belief, the size of the Volunteer Class is more than 2,000

individuals.

81.     MLB has acted or has refused to act on grounds generally applicable to the

Volunteer Class, thereby making appropriate final injunctive relief or corresponding declaratory

relief with respect to the class as a whole.

82.     Common questions of law and fact exist as to the Volunteer Class and

predominate over any questions affecting only individual members of the Volunteer Class, and

include, but are not limited to, the following:

(a)     Whether MLB has a policy or practice of failing to pay Plaintiff and the members
of the Volunteer Class the minimum wage for all hours worked in violation of
NYLL Art. 19, §§ 650 *et seq.*, and the supporting New York State Department of
Labor regulations, N.Y. Comp. Codes R. & Regs. tit. 12, § 142 *et seq.*, as alleged
herein;

13

(b)     Whether MLB failed to comply with the notice and recordkeeping requirements of the NYLL;

(c)     Whether MLB's unlawful wage and hour policies or practices as alleged herein were instituted willfully or with reckless disregard for the law; and

(d)     The nature and extent of class-wide injury and the measure of damages for those injuries.

83.     Plaintiff's claims are typical of the claims of the Volunteer Class he seeks to represent.

84.     Plaintiff and all Volunteer Class members were subject to the same or similar compensation policies and practices of MLB.  Plaintiff and the Volunteer Class have all sustained similar types of damages as a result of MLB's failure to comply with the NYLL.

85.     Plaintiff will fairly and adequately represent and protect the interests of the Volunteer Class.  Plaintiff has retained counsel competent and experienced in complex class actions and employment litigation.  There is no conflict between the Plaintiff and members of the Volunteer Class.

86.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  The members of the Volunteer Class have been damaged and are entitled to recovery as a result of MLB's common and uniform policies, practices, and procedures and as a result of MLB's violation of the NYLL.  Although the relative damages suffered by individual Volunteer Class members are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation.  Individual plaintiffs lack the financial resources to conduct a thorough examination of MLB's compensation practices and to prosecute vigorously a lawsuit against MLB to recover damages stemming from such practices.  In addition, class litigation is superior because it will prevent unduly duplicative litigation that might result in inconsistent judgments about MLB's practices.

87.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

## COLLECTIVE ACTION ALLEGATIONS

88.    Plaintiff brings the First and Second Causes of Action, the FLSA claims, on behalf of himself and all persons who have worked as unpaid volunteers for MLB between August 7, 2010 and the date of final judgment in this matter (the "Volunteer Collective").

89.    MLB is liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiff and the members of the Volunteer Collective.  Upon information and belief, the Volunteer Collective consists of many similarly situated individuals who have not been paid at all by MLB in violation of the FLSA and who would benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the lawsuit.  Those similarly situated collective members are known to MLB, are readily identifiable, and can be located through MLB's records.  Notice should be sent to the members of the Volunteer Collective pursuant to 29 U.S.C. § 216(b).

## CLASS-WIDE FACTUAL ALLEGATIONS

90.    Plaintiff and the members of the Volunteer Class and Collective defined above (collectively, "Volunteer Class Members") have been victims of a common policy and plan perpetrated by MLB that has violated their rights under the FLSA and the NYLL by denying them minimum wages.

91.    MLB promised and Volunteer Class Members reasonably expected to receive valuable compensation for performing work for MLB.

92.    Volunteer Class Members did not intend that their services were to be rendered without compensation.

93.    MLB received an immediate advantage and direct and substantial economic benefits from the work performed by the Volunteer Class Members without having to pay for it.

94.    MLB did not have to pay for an integral component of its workforce over All-Star Week.

95.    MLB did not have to pay for valuable garbage and recyclables collection services throughout the year.

96.    MLB accepted the services of the Volunteer Class Members at pay less than the legal minimum.

97.    All Volunteer Class Members performed work that helped, and did not impede, MLB's business and operations.

98.    Volunteer Class Members performed work that was essential and integral to the operation of All-Star Week, including FanFest, as well as to garbage disposal and recycling efforts at various ballparks throughout the year.  For example, Volunteer Class Members operated every attraction for tens of thousands of fans at FanFest, served as pre-game rehearsal stand-ins, prepared welcome baskets, assisted with deliveries and similar behind-the-scenes tasks, assisted with fantasy camps, set up parade floats, painted murals, greeted and directed fans, handed out gift bags, and assisted with transportation. Volunteer Class Members also collected recyclables from fans and assisted in recycling efforts at ballparks during the World Series as well as throughout the regular baseball season.

99.    Volunteer Class Members' duties and responsibilities were the same (or substantially similar) to those performed by paid employees and therefore displaced paid employees.  For example, MLB employed paid employees, including "supervisors" who performed tasks similar to the tasks the Volunteer Class Members performed, and supervised and

directed Volunteer Class Members' work at FanFest and surrounding All-Star Game events. MLB also employed paid workers to collect garbage and assist with recycling efforts.

100.    Volunteer Class Members contemplated compensation and had both an express and implied agreement to be compensated for the services they rendered. MLB required Volunteer Class Members to perform services in exchange for valuable in-kind benefits, including clothing, water bottles, free tickets, and other non-cash valuable compensation.[28]

101.    Volunteer Class Members were provided in lieu of cash payments, *inter alia*, a shirt, a cap, a cinch drawstring backpack, free admission to FanFest for themselves and one guest, a water bottle, a baseball, free admission to regular season and post-season games as Green Team members, and other compensation for their work in the form of material goods instead of cash.

102.    MLB set rules for FanFest volunteers that allowed them to "wear sneakers during working hours and khaki shorts or pants."[29] MLB also dictated what other Volunteer Class Members were required to wear.

103.    In 2013, FanFest admission had a value of approximately $35.00. In other years, it had a slightly lower but similar value.

104.    Other in-kind compensation provided to FanFest volunteers had a value of at least $40.00.

105.    Volunteer Class Members were not provided rehabilitation, food, clothing, or shelter.

---

[28]    *See* http://mlb.mlb.com/mlb/events/all_star/y2013/fanfest/faq.jsp (last visited November 25, 2013).
[29]    *See* http://mlb.mlb.com/mlb/events/all_star/y2013/fanfest/faq.jsp (last visited November 25, 2013).

106.    The relationship between MLB and the Volunteer Class Members was an arm's-length, business relationship.

107.    MLB treated Volunteer Class Members like employees by directing them to conduct activities for MLB's benefit, requiring their attendance at orientation and training sessions, directing their choice of attire, and requiring them to adhere to pre-set schedules.[30]

108.    Volunteer Class Members performed services assigned by and for the benefit of MLB with the knowledge and approval of MLB.

109.    Volunteer Class Members did not work for MLB solely for their own personal purpose or pleasure.

110.    Volunteer Class Members did not render services to MLB of the kind typically associated with volunteer work such as providing comfort to the sick, elderly, infirm, indigent, disabled, and disadvantaged.  Instead, they helped ensure that MLB's lucrative, for-profit commercial operations for the benefit of multitudes of paying fans and consumers were adequately staffed with unpaid workers.[31]

111.    Volunteer Class Members received no college credit or educational benefit from their work for MLB.

112.    Volunteer Class Members did not "donate" their time to MLB.

113.    Volunteer Class Members received no training beyond that they would receive as paid employees or any training similar to that in an educational environment.

114.    At all times relevant, MLB's unlawful conduct, policies, and patterns or practices

---

[30]    *See* http://mlb.mlb.com/mlb/events/all_star/y2013/fanfest/faq.jsp (last visited November 25, 2013).

[31]    *See* "*MLB FanFest Touted As 'Baseball Heaven on Earth,'*" CBS New York, July 10, 2013, available at http://newyork.cbslocal.com/2013/07/10/mlb-fanfest-touted-as-baseball-heaven-on-earth (last visited November 25, 2013).

described in this First Amended Class Action Complaint have been willful.

115.    MLB has intentionally, willfully, and repeatedly harmed Plaintiff and the Volunteer Class Members by engaging in a pattern, practice, and/or policy of violating the FLSA and/or the NYLL as described in this First Amended Class Action Complaint.

116.    MLB has failed to pay wages for all hours worked to Plaintiff and the Volunteer Class Members.

117.    MLB failed to pay Plaintiff and the Volunteer Class Members minimum wages for all hours worked.

118.    MLB failed to keep accurate or adequate records of hours worked by Plaintiff and the Volunteer Class Members as required by the FLSA and the NYLL.

119.    MLB's unlawful conduct described in this First Amended Class Action Complaint has been pursuant to a corporate policy or practice of minimizing labor costs and maximizing profits by denying Plaintiff and the Volunteer Class Members compensation in violation of the FLSA and NYLL.

120.    MLB's unlawful conduct has been widespread, repeated, and consistent.

121.    MLB's unlawful conduct, as set forth in this First Amended Class Action Complaint, has been intentional, willful, and in bad faith, and has caused significant damages to Plaintiff and the Volunteer Class Members.

122.    MLB's deceptive conduct prevented Plaintiff and the Volunteer Class Members from discovering or asserting their claims any earlier than they did.

123.    Among other duties, the Volunteer Class Members staffed the activities at FanFest that MLB's customers paid to attend.  These activities included, but were not limited to: ALL-STAR CLUBHOUSE - Presented by Majestic (Visit the Clubhouse and feel like a Major

Leaguer. See the official Majestic game uniforms of the 2013 MLB All-Stars and join us for Q&A sessions with MLB Legends and Hall of Fame players); ALL-STAR DUGOUT - Presented by Gatorade (Watch the events unfold on the Diamond from an All-Star's point of view in the All-Star Dugout); ALL-STAR VIDEO GAME ZONE - Presented by Blockbuster (Think you've got what it takes to be crowned king of the diamond?! Swing by the MLB 13® The Show™ interactive and take a swing for a chance to play MLB 13® The Show™ on field during the official Home Run Derby at Citi Field in New York); THE DIAMOND - Presented by T-Mobile (Play on the mini Diamond and participate in baseball clinics hosted by coaches, managers, MLB legends and current stars. Also, check out the daily MLB Mascot Home Run Derby); FAMILY FIELD - Presented by Kellogg's (Take your picture on your own trading card, participate in baseball training drills, and enjoy some Kellogg products in the snack zone); FANFEST BATTING PRACTICE - Presented by Gillette and Head & Shoulders (Practice like the pros, and test out your All-Star swing in these state-of-the-art batting cages); FANFEST ENTERTAINMENT AREA (Stop by and enjoy daily themed entertainment including bands, DJs, dance groups and more); FANFEST FIELDING PRACTICE - Presented by One A Day (Grab a glove and get ready to field ground balls, fly balls and line drives with authentic Wilson gloves at the fielding cages); FANFEST TIRE TRYOUT - Presented by Firestone (Strengthen your big league bunting and throwing skills by aiming at Firestone tire targets); FAST RELIEF PITCH (Step up to the pitcher's mound and test your arm strength while trying to throw your fastest pitch); FIELDS OF PLAY - Presented by Scotts (Learn from Scotts experts about Major League Baseball fields and maintenance of the greatest lawns in the game); HOME RUN DERBY - Presented by Chevy (Ever dreamed of hitting one out of the park? Here's your chance to step up to the plate and hit a home run over the T-Mobile All-Star FanFest outfield wall in

Home Run Derby style); HOMETOWN HEROES - Presented by Duane Reade (Visit a tribute to baseball in New York. View a collection of memorabilia and artifacts from Mets' history. Stand in an amazing life size team photo and give your best home team member pose); INFORMATION CENTER (Upon entering T-Mobile All-Star FanFest, get information on all events and appearances and find out how to obtain Fast Pass Lane tickets and bracelets); LIVE RADIO AUTOGRAPH STAGES (Come and listen to your favorite local broadcasts, meet baseball Legends and obtain free autographs); MLB.COM (Watch daily live broadcasts of mlb.com on our incredible stage as broadcasters conduct live interview sessions with current and former players, coaches, managers and MLB executives); MLB NETWORK (Fans join MLB Network "on set" as part of the MLB Network photo experience); MINOR LEAGUE BASEBALL - Presented by New Era (View New Era caps from all 160 Minor League Baseball® clubs on the MLBASFF Minor League Cap Wall while locating the teams on the massive Map Wall); THE NEGRO LEAGUES - Presented by Budweiser (Learn about the incredible history of the Negro Leagues, and pay tribute to some of the game's finest and most noble players from the league including the great Jackie Robinson); POINTS OF SWEAT - Presented by Gatorade (Thirsty from testing your All-Star skills? Stop by and grab a drink at one of the many stations located around the show floor); ROOKIE LEAGUE - Presented by Party City (Younger fans can test their skills on tailgate toss, batting cages and throwing challenges. Also, our magical face painters and balloon twisters will be there to make the experience even more fun!); STEAL A BASE, STEAL A TACO - Presented by Taco Bell (Compete against your favorite MLB base runners and try to steal second base. Make sure you pick up your Taco Bell coupon after you win the race); UNDER ARMOUR PERFORMANCE CENTER (Test your skills like the pros on this mini Under Armour baseball diamond complete with workout stations

21

including base running, fielding agility and vertical leap challenges); WORLD'S LARGEST BASEBALL (Come take a photo with the World's Largest Baseball signed by Ted Williams, Hank Aaron, Derek Jeter, Yogi Berra, Willie Mays and others).

124.    Volunteer Class Members who did not work at FanFest were, among other things, Hospitality Volunteers, Hotel Volunteers, Ticket Takers and Greeters, Transportation Volunteers, or Greeters and Starters.

125.    Hospitality Volunteers' duties and responsibilities included, among other things, answering any questions that arise about the surrounding areas and All-Star events, being a visible presence and creating excitement about the All-Star Game, creating an atmosphere of friendliness, festivity, and pride in the city, and knowing general information about the various All-Star festivities.

126.    Hospitality Volunteers' duties and responsibilities were the same during the 2011, 2012, and 2013 All Star Weeks.

127.    Ticket Takers and Greeters' duties and responsibilities included, among other things, greeting guests as they arrived at events, taking invitations and checking credentials as guests entered events, and distributing gifts to the guests at appropriate times.

128.    Ticket Takers and Greeters' duties and responsibilities were the same during the 2011, 2012, and 2013 All Star Weeks.

129.    Hotel Volunteers' duties and responsibilities included, among other things, being able to answer any questions that arise about the hotels, surrounding areas, shopping restaurants, and All-Star events, being a visible presence and creating excitement about the All-Star Game, and knowing directions to Citi Field and the Javits Center.

130.    Hotel Volunteers' duties and responsibilities were the same during the 2011,

2012, and 2013 All Star Weeks.

131.    Transportation Volunteers' duties and responsibilities included, among other things, being able to answer any questions that arise about the hotels, surrounding areas and All-Star events, being a visible presence and creating excitement about the All-Star Game, knowing general information about the various All-Star festivities, and knowing directions to Citi Field and the Javits Center.

132.    Transportation Volunteers' duties and responsibilities were the same during the 2011, 2012, and 2013 All Star Weeks.

133.    Greeters and Starters' duties and responsibilities included, among other things, being knowledgeable about bus schedules and events, maintaining communication with the dispatcher throughout their shift regarding bus arrival/departure times, knowing what credentials, tickets, or invitations are necessary to gain entrance to the destination event and ensuring all riders are carrying those items as they board, reminding the media that they need their credentials to ride the bus, and wearing their volunteer shirt, cap and credential at all times while on duty.

134.    Greeters and Starters' duties and responsibilities were the same during the 2011, 2012, and 2013 All Star Weeks.

135.    Volunteer Class Members performed similar unpaid work at the 2008, 2011, and 2012 FanFest and other All-Star Game activities.

136.    Volunteer Class Members performed other hospitality, event logistics, community events, and transportation work at the 2008, 2011, and 2012 All Star Games.

137.    In order to participate in the 2013 FanFest, MLB required Volunteer Class Members to pass a Major League Baseball background check, which was processed by MLB, and attend an information session at Citi Field.

138.    MLB required Plaintiff and other Volunteer Class Members to attend mandatory orientation sessions.

139.    At the 2013 two-hour orientation session, Volunteer Class Members received their "Player Stat Sheets" that detailed their volunteer assignments and duties; received the "Volunteer Quick Reference Guide"; met their Team Captains; received their volunteer credentials; and trained for specific responsibilities of their assigned positions.

140.    Volunteer Class Members also served as "Green Team" unpaid volunteers and performed productive work for MLB.

141.    Volunteer Class Members performed productive work for MLB at the Javits Center for FanFest, and at numerous additional locations around New York City, Phoenix, Arizona, and Kansas City, Missouri.

142.    For example, Volunteer Class Members performed productive work for MLB in New York City at Citi Field, Flushing Meadow Park, various hotels, throughout a parade route, in Central Park, and other locations.

143.    In 2013, Volunteer Class Members performed productive hospitality, transportation, meet and greet, and other work for MLB at the Affinia Shelburne, Conrad Hotel, W New York, Grand Hyatt at Grand Central, and other hotels.

144.    Volunteer Class Members also performed work for MLB as "Green Team" unpaid volunteers at multiple ballparks around the country, including but not limited to Fenway Park in Boston, AT&T Park in San Francisco, Comerica Park in Detroit, Busch Stadium in St. Louis, and Rangers Park in Arlington, Texas.

145.    MLB's All-Star Week events are not distinct from MLB's corporate offices because they are coordinated and controlled by MLB from its corporate offices.

146.    MLB solicits, recruits, and relies upon unpaid volunteer labor throughout the year, including Green Team volunteers during the regular baseball season and World Series.

147.    MLB begins recruiting volunteers for the next summer's All Star Week events in October of the prior year.

148.    MLB begins preparing for next year's All Star Game and related events approximately one year prior to the event.[32]

149.    MLB's business and operations are not seasonal.

150.    MLB's revenue-producing operations are year-round. The regular baseball season, including spring training, runs nine months – from February through October.

151.    MLB's planning and operations for next year's All Star Game and related events begin at least a year prior and it begins recruiting volunteers at least ten months prior.

152.    MLB markets and sells advertising throughout the year at various locations nationwide.

153.    MLB's paid workforce consists of at least 435 employees, all of whom work year-round.[33]

154.    MLB's coordination and planning of the All-Star Game and All-Star Week events and "Green Team" volunteers and hiring and recruitment of labor, paid and unpaid, occurs year-round.

155.    MLB is aware of FLSA and state labor law's requirements that employees be paid

---

[32]    *See* http://mlb.mlb.com/news/article.jsp?ymd=20130717&content_id=53951832&vkey=news_mlb&c_id=mlb (last visited November 25, 2013).

[33]    *See* The Institute for Ethics and Diversity in Sport's 2013 Racial and Gender Report Card: Major League Baseball (available at http://www.tidesport.org/RGRC/2013/2013_MLB_RGRC_Final_Correction.pdf) (last visited November 25, 2013).

a minimum wage and overtime.  In a September 12, 2013 memo to the top management of every

baseball club, MLB advised the clubs that the U.S. Department of Labor ("DOL") believes

wage-and-hour violations are "endemic" to the industry.  MLB also advised that it had agreed to

work with the DOL to educate each club about wage-and-hour compliance in order to avoid

"government intervention."

### PLAINTIFF'S FACTUAL ALLEGATIONS

156.    Consistent with its unlawful policies and practices, MLB subjected Plaintiff to

unlawful conduct.

157.    As an unpaid volunteer, Plaintiff worked approximately 17 hours for MLB.

158.    MLB paid Plaintiff no cash wages, but did provide him with in-kind benefits,

including a t-shirt, cap, drawstring backpack, a water bottle, and a baseball.

159.    Plaintiff attended a mandatory one-hour information session at Citi Field on June

1, 2013.

160.    Plaintiff attended a mandatory two-hour orientation session at the Javits Center on

July 10, 2013.

161.    Volunteers could be assigned to one of three shifts each day over the five-day All-

Star Week: 8:00 a.m. to 1:00 p.m.; noon to 5:00 p.m.; or 4:00 p.m. to 8:00 p.m.

162.    Plaintiff worked three shifts at FanFest at the Javits Center in Manhattan.

163.    MLB required Plaintiff to report for his first shift on Friday, July 12, 2013 at 3:30

p.m. even though his shift started at 4:00 p.m.

164.    After requiring Plaintiff and other unpaid volunteers to sit and wait for

approximately an hour, MLB gave Plaintiff his assignment and informed him of his

responsibilities.

165.    From approximately 4:45 p.m. through 8:00 p.m. on July 12, 2013, Plaintiff stamped the wrists of FanFest customers after they had a signed a liability waiver at the Fast Pitch station.

166.    At Plaintiff's second volunteer shift, on Saturday, July 13, 2013, which began at 4:00 p.m. and ended at 8:00 p.m., Plaintiff performed three separate activities.

167.    Plaintiff handed bags of FanFest paraphernalia to customers at the FanFest entrance.

168.    Plaintiff also sat in a room placing paper flyers in bags.

169.    Plaintiff also stood at the FanFest entrance and redirected people if they attempted to exit FanFest through the entrance.

170.    Plaintiff's third volunteer shift began at 7:30 a.m. on Tuesday, July 16, 2013 and ended at 1:00 p.m.

171.    During Plaintiff's third shift, he alphabetized liability waivers signed by FanFest attendees.

172.    Plaintiff also worked at a fielding station, which consisted of five machines that shot soft baseballs at customers at different speeds and angles to test their fielding skills.

173.    Plaintiff was responsible for instructing customers to deposit the balls that they fielded into buckets before moving on to the next station.

### FIRST CAUSE OF ACTION
**Fair Labor Standards Act – Minimum Wages**
**(Brought on behalf of Plaintiff and the Volunteer Collective)**

174.    Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

175.    MLB has engaged in a widespread pattern, policy, and practice of violating the

FLSA, as detailed in this First Amended Class Action Complaint.

176.    The minimum wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq.*, and the supporting federal regulations, apply to MLB and protect Plaintiff and the members of the Volunteer Collective.

177.    At all relevant times, Plaintiff and the members of the Volunteer Collective were employed by an entity engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (m), and 206(a), and/or they were engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r), and (s).

178.    At all relevant times, Plaintiff and the members of the Volunteer Collective were employees of MLB within the meaning of 29 U.S.C. § 203(e).

179.    At all relevant times, MLB has been an enterprise engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r), and (s).

180.    At all relevant times, MLB employed Plaintiff and the members of the Volunteer Collective within the meaning of 29 U.S.C. § 203(g).

181.    MLB has engaged in a policy and/or practice of failing to pay Plaintiff and the Volunteer Collective the applicable minimum wage for all hours they suffered or permitted them to work.

182.    As a result of these minimum wage violations, Plaintiff and the members of the Volunteer Collective have suffered damages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

183.    MLB's unlawful conduct, as described in this First Amended Class Action

Complaint, has been willful and intentional.  MLB was aware or should have been aware that the practices described in this First Amended Class Action Complaint are unlawful as demonstrated by the September 12, 2013 memo it sent to every baseball club.  Though MLB has made an effort to "educate" baseball clubs about compliance with FLSA, MLB itself has not made a good-faith effort to comply with the FLSA with respect to the compensation of Plaintiff and the members of the Volunteer Collective.

184.    Because MLB's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

185.    Members of the Volunteer Collective are entitled to collectively participate in this action by choosing to "opt-in" and submitting written Consents to Join this action.  29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
### Fair Labor Standards Act – Recordkeeping Violations
### (Brought on behalf of Plaintiffs and the Volunteer Collective)

186.    Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

187.    MLB failed to make, keep, and preserve accurate records with respect to  Plaintiff and members of the Volunteer Collective, including hours worked each workday and total hours worked each workweek, as required by the FLSA, 29 U.S.C. § 211(c), and supporting federal regulations.

## THIRD CAUSE OF ACTION
### New York Labor Law Article 19 – Minimum Wage
### (Brought on behalf of Plaintiff and the Volunteer Class)

188.    Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

189.    MLB failed to pay Plaintiff and the members of the Volunteer Class the minimum wages to which they are entitled under the NYLL.

190.    MLB has engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this First Amended Class Action Complaint.

191.    At all times relevant, Plaintiff and the members of the Volunteer Class have been employees and MLB has been an employer within the meaning of NYLL §§ 190, 651(5), 652 and the supporting New York State Department of Labor Regulations.

192.    The minimum wage provisions of Article 19 of the NYLL and the supporting New York State Department of Labor regulations apply to MLB and protect Plaintiff and the members of the Volunteer Class.

193.    MLB was required to pay Plaintiff and the members of the Volunteer Class a minimum wage at a rate of (a) $7.15 per hour for all hours worked from January 1, 2007 through July 23, 2009; and (b) $7.25 per hour for all hours worked from July 24, 2009 through the present, under NYLL § 652 and the supporting New York State Department of Labor regulations.

194.    MLB failed to pay Plaintiff and the members of the Volunteer Class minimum hourly wages for all hours worked to which they are entitled under the NYLL and the supporting New York State Department of Labor regulations.

195.    By MLB's knowing or intentional failure to pay Plaintiff and the members of the Volunteer Class minimum hourly wages for all of the hours they worked, MLB has willfully violated the NYLL Art. 19 §§ 650 *et seq*. and the supporting New York State Department of Labor regulations.

196.    Due to MLB's violations of the NYLL, Plaintiff and the members of the

Volunteer Class are entitled to recover from MLB their unpaid wages, liquidated damages, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

### FOURTH CAUSE OF ACTION
**New York Labor Law Article 19 – Recordkeeping Violations**
**(Brought on behalf of Plaintiff and the Volunteer Class)**

197.    Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

198.    MLB failed to make, keep, and preserve accurate records with respect to Plaintiff and the Volunteer Class Members, including hours worked each workday and total hours worked each workweek, as required by NYLL § 661 and supporting regulations.

### FIFTH CAUSE OF ACTION
**New York Labor Law Article 6 – Notice and Recordkeeping Violations**
**(Brought on behalf of Plaintiff and the Volunteer Class)**

199.    Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

200.    MLB failed to make, keep, and preserve accurate records with respect to Plaintiff and the Volunteer Class Members, including hours worked each workday and total hours worked each workweek, as required by NYLL § 195(4) and supporting regulations.

201.    MLB failed to provide Plaintiff and the Volunteer Class Members a notice containing the rate or rates of pay and basis thereof, the regular pay day, and other information required by NYLL § 195(1)(a).

202.    MLB failed to provide Plaintiff and the Volunteer Class Members a statement with every payment of wages, as required by NYLL § 195(3).

203.    Due to MLB's violations of the NYLL, Plaintiff and the members of the Volunteer Class are entitled to recover from MLB statutory damages for each work week that

31

each violation occurred, as well as reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest, pursuant to NYLL § 198.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of all other similarly situated persons, seeks the following relief:

A.    That, at the earliest possible time, Plaintiff be allowed to give notice of this collective action, or that the Court issue such notice, to the members of the Volunteer Collective, as defined above.  Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

B.    Unpaid minimum wages and an additional and an equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

C.    Unpaid minimum wages pursuant to NYLL Art. 19, §§ 650 *et seq*., and the supporting New York State Department of Labor regulations, and an additional and equal amount as liquidated damages pursuant to NYLL § 663;

D.    Statutory damages for MLB's notice and recordkeeping violations pursuant to NYLL Art. 6, §§ 190 *et seq*.;

E.    Certification of the Volunteer Class set forth above pursuant to Rule 23 of the Federal Rules of Civil Procedure;

F.    Designation of Plaintiff as class representative of the Volunteer Class, designation of counsel of record as Class Counsel, and a reasonable incentive payment to Plaintiff;

G.        Pre-judgment interest and post-judgment interest;

H.        Issuance of a declaratory judgment that the practices complained of in this

Class Action Complaint are unlawful under NYLL Art. 6, §§ 190 *et seq.*, NYLL Art. 19, §§ 650

*et seq.*, and the supporting New York State Department of Labor regulations;

I.        An injunction requiring MLB to pay all statutorily required wages pursuant to

the NYLL and an order enjoining MLB from continuing or reinstating their unlawful policies

and practices as described herein with respect to the Class and Collective set forth above;

J.        Reasonable attorneys' fees and costs of the action;

K.        Such other relief as this Court shall deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury on all questions of fact raised by this First Amended Class Action Complaint.

Dated:  New York, New York
        November 25, 2013

Respectfully submitted,
**OUTTEN & GOLDEN LLP**

By:

Justin M. Swartz

**OUTTEN & GOLDEN LLP**
Justin M. Swartz
Juno Turner
Michael N. Litrownik
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone:  (212) 245-1000
***Attorneys for Plaintiff and the Class***

33

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN CHEN, on behalf of himself and all others similarly situated, | No. 13 Civ. 5494 (JGK) |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| MAJOR LEAGUE BASEBALL PROPERTIES, INC. and THE OFFICE OF THE COMMISSIONER OF BASEBALL, d/b/a/ MAJOR LEAGUE BASEBALL. | **JURY TRIAL DEMANDED** |
| Defendants. | |

I, Jeffrey Domanico, under penalties of perjury, certify the following as true and correct:

I am not a party to this action; and I am over 18 years of age. On the 25th day of November

2013, I served a true and correct copy of the foregoing documents: **First Amended Class Action**

**Complaint**, and, herewith by causing same to be served by **Email and U.S. Mail** to the

following attorney of record for Defendants in this action, whose address is:

Elise M. Bloom, Esq.
**Proskauer Rose LLP**
11 Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
ebloom@proskauer.com

Dated: November 25, 2013

Jeffrey Domanico, Paralegal
Outten & Golden LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Tel: (212) 245-1000
Fax: (212) 977-4005

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

JOHN CHEN,

                            **Plaintiff,**               13 Civ. 5494 (JGK)

            - against -                 **OPINION AND ORDER**

MAJOR LEAGUE BASEBALL, ET AL.,

                        **Defendants.**

_____

**JOHN G. KOELTL, District Judge:**

    Plaintiff John Chen brought suit against Defendants Major League Baseball Properties, Inc. and the Office of the Commissioner of Baseball (collectively, "defendants" or "MLB") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and the New York Labor Law ("NYLL"), §§ 190 et seq. & 650 et seq., claiming violations of his right to receive a minimum wage. The plaintiff alleges that he worked for MLB as an unpaid volunteer during the week of the July 2013 Baseball All Star Game at an installation for fans at the Javits Center in New York City, and that he is entitled to minimum wage compensation for this work. The plaintiff has moved this Court to grant conditional certification of, and provide court-authorized notice to, a proposed class of similarly situated plaintiffs pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). Also before the Court is the defendants' motion to dismiss the

1

plaintiff's First Amended Class Action Complaint pursuant to
Rule 12(b)(6) of the Federal Rules of Civil Procedure for
failure to state a claim upon which relief can be granted.  For
the reasons explained below, the defendants' motion to dismiss
is granted and the plaintiff's motion for collective
certification and court-authorized notice is denied as moot.


I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiff's favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007).  The Court's function on a motion to dismiss is "not to
weigh the evidence that might be presented at a trial but merely
to determine whether the complaint itself is legally
sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.
1985).  The Court should not dismiss the complaint if the
plaintiff has stated "enough facts to state a claim to relief
that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007).  "A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the
misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678

2

(2009).  While the Court should construe the factual allegations
in the light most favorable to the plaintiff, "the tenet that a
court must accept as true all of the allegations contained in
the complaint is inapplicable to legal conclusions."  Id.

When presented with a motion to dismiss pursuant to Rule
12(b)(6), the Court may consider documents that are referenced
in the complaint, documents that the plaintiff relied on in
bringing suit and that are either in the plaintiff's possession
or that the plaintiff knew of when bringing suit, or matters of
which judicial notice may be taken.  See Chambers v. Time
Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); see also
Winfield v. Citibank, N.A., 842 F. Supp. 2d 560, 564 (S.D.N.Y.
2012).

II.

The following allegations are accepted as true for the
purposes of these motions.  The July 2013 Baseball All Star Game
took place at Citi Field in New York City.  (See Am. Compl.
¶ 25.)  In connection with the All Star Game, MLB put on a
series of "All Star Week festivities" throughout New York City,
including a race, a concert, a fantasy camp, a parade, and an
event called "FanFest."  (Am. Compl. ¶¶ 1-3.)  FanFest took
place at the Javits Center in New York City during the week of

3

the 2013 All Star Game, from July 12 to July 16, 2013.  (Am.
Compl. ¶¶ 18, 141; Decl. of Elise M. Bloom ("Bloom Decl."), Ex.
C[1] at 1.)  The event was described by MLB as "the largest
interactive baseball theme park in the world."  (Am. Compl.
¶ 2.)  Activities at FanFest included baseball video games, a
simulated baseball dugout, baseball clinics, batting cages,
music events, and autograph opportunities.  (Am. Compl. ¶ 123.)

All of the 2013 All Star Week festivities in New York City
were staffed generally with volunteers.  (Am. Compl. ¶¶ 1-4.)
These individuals were not paid any cash wages for their work,
but instead received "in-kind benefits," such as t-shirts, caps,
drawstring backpacks, water bottles, baseballs, lanyards, free
admission to FanFest for each volunteer and a guest, and a
chance to win a ticket to the All Star Game.  (Am. Compl. ¶¶ 6,
31, 158.)  Admission to FanFest in 2013 was worth approximately
$35, and the other in-kind compensation received by the
volunteers was worth at least $40.  (Am. Compl. ¶¶ 103-04.)  In

---

[1] Counsel for the defendants has affirmed in a sworn declaration
that this exhibit depicts the webpage available at
http://mlb.mlb.com/mlb/downloads/y2013/fanfest_map.pdf, (see
Bloom Decl. ¶ 4), which the plaintiff has explicitly relied upon
in his Complaint, (see Am. Compl. ¶ 27), and which may therefore
properly be taken into consideration in deciding this motion to
dismiss.  See Chambers, 282 F.3d at 152-53.

2013, approximately two thousand volunteers staffed the various
All Star Week festivities in New York City.  (Am. Compl. ¶ 4.)

The plaintiff is an adult residing in New York who worked
three shifts, totaling approximately seventeen hours, at FanFest
during the 2013 All Star Week.  (Am. Compl. ¶¶ 49-50, 157, 162.)
Prior to his shifts, the plaintiff attended a mandatory one-hour
information session at Citi Field on June 1, 2013 and a
mandatory two-hour orientation session at the Javits Center on
July 10, 2013.  (Am. Compl. ¶¶ 159-160.)  During his first
shift, on July 12, 2013, the plaintiff stamped the wrists of
FanFest attendees after they had signed liability waivers.  (Am.
Compl. ¶¶ 163, 165.)  At his second shift on the following day,
the plaintiff handed out bags of paraphernalia to attendees at
the entrance, placed paper flyers in bags, and redirected
attendees who attempted to exit the event through the entrance.
(Am. Compl. ¶¶ 166-69.)  During his third shift, on July 16,
2013, the plaintiff alphabetized liability waivers and worked at
a "fielding station" instructing attendees to deposit the balls
they fielded into buckets before moving to the next station.
(Am. Compl. ¶¶ 170-73.)  The plaintiff received no cash wages
for this work, but did receive in-kind benefits such as a t-
shirt, a cap, a drawstring backpack, a water bottle, and a
baseball.  (Am. Compl. ¶ 158.)

On August 7, 2013, the plaintiff filed this lawsuit.  On
August 15, 2013, the plaintiff filed the present motion for
collective certification and court-authorized notice,
requesting, among other things, that a proposed collective
consisting of himself and similarly situated individuals who
worked as volunteers at various All Star Week events since
August 7, 2010 be conditionally certified, and that putative
plaintiffs receive court-authorized notice of their right to
join the lawsuit.  After the defendants file a motion to
dismiss, the plaintiff filed the First Amended Class Action
Complaint on November 25, 2013, and the initial motion to
dismiss was denied without prejudice.

In the First Amended Class Action Complaint, the plaintiff
alleges that the defendants failed to pay him the minimum wages
required by the FLSA and the NYLL for his work at FanFest.  (See
Am. Compl. ¶¶ 156-85, 188-96.)  The plaintiff also alleges that
the defendants failed to comply with the recordkeeping
requirements of the FLSA and the NYLL.  (See Am. Compl. ¶¶ 186-
87, 197-203.)  The defendants have now moved to dismiss the
First Amended Class Action Complaint (hereinafter "Complaint").

III.

The defendants proffer two bases upon which the plaintiff's claims should be dismissed.  First, the defendants argue that the plaintiff is not an "employee" as that term is defined in the FLSA because he worked for the defendants only as a volunteer, and he is therefore not entitled to minimum wages. See 29 U.S.C. §§ 203(e)(1) (defining "employee") & 206(a) (requiring that "employees" receive a minimum wage).  Second, the defendants argue that even if the plaintiff is an "employee," he is still not entitled to minimum wages because he worked for an "amusement or recreational establishment" that is exempt from the FLSA's minimum wage requirement under Section 13(a)(3) of the FLSA, 29 U.S.C. § 213(a)(3).  As explained below, the plaintiff's claims under the FLSA must be dismissed because the "amusement or recreational establishment" exemption in Section 13(a)(3) applies in this case.  Accordingly, there is no occasion to reach the question of whether the plaintiff is properly classified as an "employee" under the FLSA.[2]

---

[2] Both parties agree that dismissal of the FLSA minimum wage claim would require the Court to dismiss the FLSA recordkeeping claim.  (See Oral Arg. Tr. at 3-4.)  They also agree that the applicability of the Section 13(a)(3) exemption has no effect on the NYLL claims.  Accordingly, the NYLL claims are addressed in Subsection III.C, below.



A.

Congress enacted the FLSA in order to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." Id. § 202(a).  To that end, Section 6 of the FLSA states that "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, [certain minimum wages]." Id. § 206(a).  The Second Circuit Court of Appeals has emphasized that the FLSA "is a remedial [statute], written in the broadest possible terms so that the minimum wage provisions would have the widest possible impact in the national economy." Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 (2d Cir. 1984).

Nevertheless, Section 13 of the FLSA contains a litany of exemptions to the minimum wage requirement.  See 29 U.S.C. § 213.  These exemptions are affirmative defenses, for which employers have the burden of proof. Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974); Bilyou v. Dutchess Beer Distribs., Inc., 300 F.3d 217, 222 (2d Cir. 2002).  The exemptions must be "narrowly construed against the employers seeking to assert them and their application limited to those


establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960).

At the motion-to-dismiss stage, an FLSA claim may be dismissed on the basis of an exemption only if the exemption "appears on the face of the complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998); see also Hill v. Del. N. Cos. Sportservice, Inc., No. 11 Civ. 753S, 2012 WL 2405233, at *2 (W.D.N.Y. June 25, 2012) (noting that the Section 13 exemptions are affirmative defenses that permit dismissal under Rule 12(b)(6) only where they "appear[] on the face of the complaint"); Beaulieu v. Vermont, No. 10 Civ. 032, 2010 WL 3632460, at *6 (D. Vt. Aug. 5, 2010) ("Where the Complaint contains allegations that unequivocally qualify an employee as exempt from the overtime provisions, a 12(b)(6) motion will be granted.").

The defendants argue that they cannot be liable to the plaintiff for minimum wages because it is clear from the face of the Complaint that the "amusement or recreational establishment" exemption in Section 13(a) applies in this case. Section 13(a) provides in relevant part that the minimum wage provisions of "section 206 . . . shall not apply with respect to . . . any employee employed by an establishment which is an amusement or

recreational establishment . . . if . . . it does not operate for more than seven months in any calendar year . . . ." 29 U.S.C. § 213(a)(3). According to the defendants, this exemption applies because the plaintiff was employed by FanFest, which the pleadings show to have been an "amusement or recreational establishment" that operated for fewer than eight months during 2013. The plaintiff counters that the "amusement or recreational establishment" exemption does not apply in this case because he was employed not by FanFest, but by MLB, which operated for more than eight months in 2013. The plaintiff also argues that it would be inappropriate to dismiss his FLSA claims under Rule 12(b)(6) on the basis of a Section 13 exemption because he is not required to plead the absence of an affirmative defense, and he has not yet had the opportunity for discovery.

1.

There is no dispute between the parties that baseball constitutes "amusement or recreation[]" for purposes of the exemption. Rather, the disagreement between the parties as to the applicability of the Section 13(a)(3) exemption centers upon the meaning of the term "establishment" in the phrase "amusement or recreational establishment." 29 U.S.C. § 213(a)(3). The

10

FLSA does not explicitly define this term, and courts have generally concluded that the language of the Section 13(a)(3) exemption is ambiguous. See, e.g., Chao v. Double JJ Resort Ranch, 375 F.3d 393, 396-97 (6th Cir. 2004); Ivanov v. Sunset Pools Mgmt. Inc., 567 F. Supp. 2d 189, 192 (D.D.C. 2008).

The legislative history is sparse. Courts have noted that a House Committee Report on a proposed 1965 amendment to the FLSA stated that the "amusement or recreational establishment" exemption was meant to cover "such seasonal recreational or amusement activities as amusement parks, carnivals, circuses, sport events, parimutel racing, sport boating or fishing, or other similar or related activities."[3] Brock v. Louvers and Dampers, Inc., 817 F.2d 1255, 1258 (6th Cir. 1987) (quoting H.R. Rep. No. 89-871 (1965)). During floor debates on the amendment that eventually became the Section 13(a)(3) exemption, Senator Yarborough stated that he believed the exemption was meant to

---

[3] The proposed amendment to which the statement in this report pertains was not enacted in 1965, but the language is nevertheless relevant because Congress enacted the amendment the following year. See Brennan v. Texas City Dike & Marina, Inc., 492 F.2d 1115, 1118 n.8 (5th Cir. 1974). Indeed, during floor debates on the 1966 amendment, Representative Dent was asked whether the amendment under consideration "retain[ed] the existing exemption for amusement or recreational establishments, such as amusement parks, sports events, parimutuel racing, sport boating or fishing and similar activities," and he answered in the affirmative. 112 Cong. Rec. 11,293 (1966).

cover only amusement parks.  112 Cong. Rec. 20,594, 20,791 (1966); see also Texas City Dike & Marina, 492 F.2d at 1118. The purpose of the exemption is not immediately clear from its text or its legislative history, but the exemption is generally thought to have been "provided in the [FLSA] so as to allow recreational facilities to employ young people on a seasonal basis and not have to pay the relatively high minimum wages required by the [FLSA]."  Brennan v. Yellowstone Park Lines, Inc., 478 F.2d 285, 288 (10th Cir. 1973); see also Louvers, 817 F.2d at 1259 ("The logical purpose of the provision is to exempt . . . amusement and recreational enterprises . . . which by their nature, have very sharp peak and slack seasons. . . . Their particular character may require longer hours in a shorter season, their economic status may make higher wages impractical, or they may offer non-monetary rewards.").

     Department of Labor ("DOL") regulations define "establishment" for the purposes of several provisions in the FLSA, including Section 13(a)(3), as "a 'distinct physical place of business,'" as opposed to "'an entire business or enterprise' which may include several separate places of business."  29 C.F.R. § 779.23; see also id. § 779.203 ("The term establishment means a distinct physical place of business rather than an entire business or enterprise.").  Elsewhere the regulations

provide that "[t]ypical examples of [amusement or recreational establishments] are the concessionaires at amusement parks and beaches." Id. § 779.385.

The Complaint alleges that FanFest was "a lucrative, for-profit commercial operation that MLB promoted as the largest interactive baseball theme park in the world, and described as baseball heaven on earth." (Am. Compl. ¶ 2 (internal quotation marks omitted).) Moreover, FanFest is alleged to have taken place at the Javits Center in New York City from July 12 to July 16, 2013. (Am. Compl. ¶¶ 18, 141; see also Bloom Decl., Ex. C at 1.) Taken in light of the statutory language, the legislative history, and the relevant administrative interpretations, these allegations establish that FanFest was an "amusement or recreational establishment" for purposes of the Section 13(a)(3) exemption.

First, it is not disputed that FanFest was a "sports event[]," which is among the core categories enumerated in the legislative history and widely recognized as covered by the exemption. See Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 595 (11th Cir. 1995) (adopting the opinion of the District Court); Louvers, 817 F.2d at 1258; Texas City Dike & Marina, 492 F.2d at 1118; Ivanov, 567 F. Supp. 2d at 192; Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 469 F. Supp. 2d 1086, 1089

(M.D. Fla. 2006); <u>Bridewell v. Cincinnati Reds</u>, No. C-1-93-203, 1994 WL 854075, at *3 (S.D. Ohio Feb. 14, 1994) (opinion of the Magistrate Judge), <u>adopted with modifications by</u> <u>Bridewell v. Cincinnati Reds</u>, No. C-1-93-203, 1994 WL 866091, at *1 (S.D. Ohio Mar. 24, 1994), <u>rev'd on other grounds</u>, 68 F.3d 136 (6th Cir. 1995). Indeed, FanFest is alleged not only to have been a sports event, but also a "theme park," (Am. Compl. ¶ 2), which is an independent reason to conclude that it falls squarely within the coverage of the exemption. <u>See, e.g.</u>, <u>Louvers</u>, 817 F.2d at 1258 (listing "amusement parks" as the first example of an "amusement or recreational establishment" in the legislative history); 29 C.F.R. § 779.385 (listing "amusement parks" as an example of "amusement or recreational establishments" under the statute). Moreover, FanFest is alleged to have taken place at a discrete location (the Javits Center) over a discrete period in time (All Star Week). (Am. Compl. ¶¶ 18, 62, 141; Bloom Decl., Ex. C at 1.) This makes it a "distinct physical place of business," which places it squarely within the administrative definition of an "establishment" for Section 13(a)(3) purposes. <u>See</u> 29 C.F.R. §§ 779.23, 779.203, 779.385.

The plaintiff alleges that FanFest lasted for fewer than five days. (Am. Compl. ¶¶ 18, 62.) Thus, by the plaintiff's own allegations, he was employed at an "amusement or

recreational establishment" which "d[id] not operate for more than seven months in any calendar year." 29 U.S.C. § 213(a)(3). The Complaint therefore contains facts establishing the defendants' affirmative defense.

2.

The plaintiff argues that the foregoing analysis proceeds at the wrong level of generality. He asserts that he was employed not by FanFest but by MLB, which is not an amusement or recreational establishment that operates for fewer than eight months in a calendar year. Thus, according to the plaintiff, the Section 13(a)(3) exemption does not apply.

This argument is contradicted by the clear import of the relevant DOL regulations, the validity of which has not been challenged, and which, in any event, are persuasive and therefore entitled to deference.[4] The regulations draw a

_____

[4] The regulations relevant to the "amusement or recreational establishment" exemption were not promulgated pursuant to an express delegation of rulemaking authority by congress, see 29 U.S.C. § 13(a)(3); cf. English v. Ecolab, Inc., No. 06 Civ. 5672, 2008 WL 878456, at *6 (S.D.N.Y. Mar. 31, 2008); notice-and-comment procedures were not used, see 35 Fed. Reg. 5856, 5856 (Apr. 9, 1970); and the agency in promulgating them described them as "interpretive rules." Id. Accordingly, under the Supreme Court's guidelines in Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 172-74 (2007), they are most properly considered "interpretive rules," and therefore subject to

15

A-58

repeated distinction between "establishments," on the one hand, and "enterprises," on the other.  An "establishment" is defined as a "distinct physical place of business."  29 C.F.R. § 779.23. By contrast, an "enterprise . . . may include several separate places of business."[5]  Id. (internal quotation marks omitted). "[An] enterprise may consist of a single establishment which may be operated by one or more employers; or it may be composed of a number of establishments which may be operated by one or more employers."  Id. § 779.203 (internal citations omitted).  Thus, in the case of a "multiunit" business, "one company conducts its

---

Skidmore deference—meaning that the weight accorded to them depends upon "the thoroughness evident in [their] consideration, the validity of [their] reasoning, [their] consistency with earlier and later pronouncements, and all those factors which give [them] power to persuade . . . ."  Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).  As demonstrated in the analysis that follows, the regulations relevant to the "amusement or recreational establishment" exemption are well-reasoned, internally consistent, and generally consistent with judicial interpretations of the exemption; they are therefore particularly instructive in this case.

[5] This interpretation draws support from the legislative history of a related exemption in Section 13 for a "retail or service establishment" (since repealed).  During Senate floor debates on the "retail or service establishment" exemption, Senator George, who had sponsored the amendment, stated, "I wish to say that the word 'establishment' has been very well defined in the Wage and Hour Act.  It means now a *single physically separate place of business . . . and it does not mean an entire business enterprise*."  Mitchell v. Birkett, 286 F.2d 474, 477 (8th Cir. 1961) (emphasis added) (quoting 95 Cong. Rec. 12,579 (1949)).

single business in a number of establishments."  Id. § 779.204.

The regulations provide an example:

> [A] manufacturer may operate a plant for production of its
> goods, a separate warehouse for storage and distribution,
> and several stores from which its products are sold.  Each
> such physically separate place of business is a separate
> establishment.  In the case of chain store systems, branch
> stores, groups of independent stores organized to carry on
> business in a manner similar to chain store systems, and
> retail outlets operated by manufacturing or distributing
> concerns, each separate place of business ordinarily is a
> separate establishment.

Id. § 779.303.

Here, the plaintiff alleges that MLB is "a single

integrated enterprise" with its corporate offices at 245 Park

Avenue in Manhattan, and that FanFest was a roughly week-long

event that took place at the Javits Center.  (Am. Compl. ¶¶ 18,

62, 74, 141; Bloom Decl., Ex. C at 1.)  Taken as true, these

allegations indicate that FanFest was the establishment that

employed the plaintiff for the purposes of Section 13(a)(3).  It

is of no consequence that MLB "coordinated and controlled" the

events of All Star Week from its corporate office, (Am. Compl.

¶ 145), because physical distinctness, rather than operation or

control, is what distinguishes an "enterprise" from an

"establishment" to which it may belong.  See 29 C.F.R.

§ 779.203; see also Chessin v. Keystone Resort Mgmt., Inc., 184

F.3d 1188, 1192 (10th Cir. 1999) ("In focusing on administrative

and economic integration, Plaintiffs misconstrue the meaning of

17

'establishment' under the FLSA. . . . Congress used the word 'establishment' to mean a distinct physical place of business rather than an integrated business enterprise." (citations and internal quotation marks omitted)); <u>Yellowstone Park Lines</u>, 478 F.2d at 289 ("'[E]stablishment' . . . mean[s] . . . a single physically separate place of business.").[6]

It is also of no consequence that the plaintiff was employed by MLB rather than by FanFest; for the purposes of Section 13(a)(3), an individual is employed by the establishment at which he works, regardless of any enterprise that may operate or control the establishment. <u>See</u> 29 U.S.C. § 213(a)(3) (exempting "any employee *employed by an establishment* which is an amusement or recreational establishment" (emphasis added)); 29 C.F.R. §§ 779.23, 779.203, 779.303 (distinguishing

_____

[6] Courts have reached the same conclusion in construing the word "establishment" in the former "retail or service establishment" exemption previously contained in Section 13(a)(2) of the FLSA. <u>See</u> <u>A.H. Phillips, Inc. v. Walling</u>, 324 U.S. 490, 496-97 (1945) ("Congress used the word 'establishment' [in the 'retail or service establishment exemption'] as it is normally used in business and in government—as meaning a distinct physical place of business. . . . Moreover, it is quite apparent from the sparse legislative history of [the exemption] that Congress did not intend to exempt as a 'retail establishment' the . . . central office of an interstate chain store system."); <u>Birkett</u>, 286 F.2d at 478 ("Common ownership and close functional and economic relationship between physically separated units of a business are not sufficient to make such combined units a single [retail or service] establishment . . . .").

18

establishments from the enterprises that control them); cf.
Ecolab, 2008 WL 878456, at *9 ("Congress chose to use the
individual establishment, rather than the entire enterprise, as
the business unit for evaluating the applicability of the
exemption.  An 'establishment' is a distinct, physical place of
business, while an 'enterprise' is the largest unit of corporate
organization . . . .  Thus, the relevant inquiry is . . .
whether . . . Plaintiffs were employed by a qualifying
establishment at the local or regional level." (citing 29 C.F.R.
§§ 779.23, 779.303)).

The plaintiff relies on two cases that have found sports
franchises to constitute "establishments" for Section 13(a)(3)
purposes.  In Jeffery v. Sarasota White Sox, Inc., the Eleventh
Circuit Court of Appeals concluded that the Sarasota White Sox,
a minor league baseball team, was "an amusement or recreational
establishment pursuant to 29 U.S.C. § 213."  64 F.3d at 595.
The court found that the Sarasota White Sox qualified for the
exemption because of the seasonal use of the baseball complex in
Sarasota, Florida for minor league baseball games and for spring
training for the Chicago White Sox, the parent of the Sarasota
White Sox.  Id. at 593, 595.  The court did not factor into the
availability of the exemption the activities of the Chicago
White Sox during the other months of the year at other physical

locations.   In <u>Bridewell v. Cincinnati Reds</u>, the District Court adopted the Magistrate Judge's conclusion that the Cincinnati Reds, "as owner of a major league baseball franchise, [was] an amusement or recreational establishment" for Section 13(a)(3) purposes.   1994 WL 854075, at *4, <u>adopted with modifications by</u> <u>Bridewell v. Cincinnati Reds</u>, 1994 WL 866091, at *1, <u>rev'd on</u> <u>other grounds</u>, 68 F.3d 136.   On appeal, the Sixth Circuit Court of Appeals assumed without deciding that the Cincinnati Reds was an "amusement or recreational establishment," and concluded that the Reds did not qualify for the Section 13(a)(3) exemption because the team "operate[d] for more than seven months per year."   68 F.3d at 138.   It was clear from the stipulated facts that the activities of the Reds were conducted year-round at Riverfront Stadium, where Reds employees performed cleaning and maintenance work during the baseball season and the off-season. <u>Id.</u> at 137-39.   The plaintiff argues that MLB is analogous to the sports franchises in <u>Jeffery</u> and <u>Bridewell</u>,[7] both of which

---

[7] The plaintiff also relies on two District Court cases.   In <u>Liger v. New Orleans Hornets NBA Ltd. P'Ship</u>, the court followed the reasoning of <u>Bridewell</u>, rather than <u>Jeffery</u>, and concluded that the New Orleans Hornets basketball franchise was an "amusement or recreational establishment," but found that the team operated "for at least eight months each year" and therefore did not qualify for the exemption.   565 F. Supp. 2d 680, 683-84 (E.D. La. 2008).   In <u>Adams v. Detroit Tigers, Inc.</u>, the court cited <u>Jeffery</u> for the proposition that "[m]ajor-league baseball teams"—in this case, the Detroit Tigers—"may properly


were deemed "establishments" for Section 13(a)(3) purposes, and that because MLB is undisputedly a year-round operation, the exemption should not apply.

The plaintiff's reliance on these cases is misplaced.  In Jeffery and Bridewell, the plaintiffs were employed in physical locations where the defendants conducted the sporting events that satisfied the definition of an "amusement or recreational establishment."  Jeffery was a suit by a groundskeeper at the Sarasota baseball complex.  64 F.3d at 593.  Bridewell was a suit by maintenance employees at Cincinnati's Riverfront Stadium.  68 F.3d at 137.  Neither case involved a suit by employees who worked at an event or amusement area that was physically distinct from the location of the baseball franchise's central ballpark.  Here, by contrast, FanFest is alleged to have been a roughly week-long "sports event" that took place at the Javits Center—a location that was physically

---

be considered 'recreational' establishments"—and went on to address the separate issue of whether the plaintiff batboys could properly be considered a separate establishment within the Tigers.  961 F. Supp. 176, 179 (E.D. Mich. 1997).  There was no issue in either Liger or Adams about the proper treatment of a seasonal sporting event held at a separate physical place of business.

separate from the enterprise to which FanFest belonged—namely, MLB.[8]

Indeed, as one court recently noted, "[a]rguably, the only reason for defining 'establishment' as a distinct physical place of business [in 29 C.F.R. § 779.23] was so that it could be distinguished from an integrated business enterprise." Wright v. Adventures Rolling Cross Country, Inc., No. 12 Civ. 982, 2013 WL 1758815, at *5 (N.D. Cal. Apr. 24, 2013). This conclusion flows from the repeated comparison between "enterprises" and "establishments" throughout the relevant regulations. See 29 C.F.R. §§ 779.23, 779.203, 779.303. In a case involving a multiunit enterprise, the physical location of a given establishment distinguishes it from the parent enterprise.[9] See

_____

[8] Notably, the relevant duration of operations in Jeffery was the time that the Sarasota White Sox and the parent Chicago White Sox operated at the baseball complex in Florida—not the duration of the Chicago White Sox's operations as a whole. Similarly, what matters in this case is the duration of MLB's operations at the Javits Center—a physically distinct location where the plaintiff was employed—not MLB's operations as a whole.

[9] At oral argument, the plaintiff argued for the first time that the distinction throughout the regulations between "establishments" as "distinct physical place[s] of business" and the "enterprises" to which they belong should apply exclusively to the "retail or service establishment" exemption, and not to the "amusement or recreational establishment" exemption. (See Oral Arg. Tr. at 29-30.) This position finds no support in the regulations themselves, see 29 C.F.R. § 779.23 ("As used in the [FLSA], term establishment . . . refers to a 'distinct physical

22

29 C.F.R. §§ 779.23, 779.303; see also Chessin, 184 F.3d at 1192-93 (concluding that two ski areas operated by a single enterprise constituted distinct establishments by virtue of their physical separation); Yellowstone Park Lines, 478 F.2d at 289-90 (concluding that due to physical separation, various restaurants, hotels, and lodges in Yellowstone National Park were "separate establishment[s]").  This is just such a case: taking the facts alleged in the Complaint as true, they establish that FanFest was a sports event that was physically separate from the enterprise through which it was operated and controlled.  (See Am. Compl. ¶¶ 74, 141; see also Bloom Decl.,

---

place of business' rather than to 'an entire business or enterprise' which may include several separate places of business. . . .  [T]his is the meaning of the term as used in section[] . . . 13(a) . . . of the Act." (emphasis added)), and is contradicted by cases that focus on physical separation to define the boundaries of an establishment under the "amusement or recreational establishment" exemption.  See Chessin, 184 F.3d at 1192; Yellowstone Park Lines, 478 F.2d at 289.  The plaintiff also argued that the definition of an establishment as a physical place of business should apply only for the purposes of determining whether the establishment is for "amusement or recreational" purposes, and not for the purposes of determining whether it operated for more than seven months in the calendar year.  (See Oral Arg. Tr. at 26-28.)  This argument is similarly without support in the text of the statute, the regulations, or the relevant case law, all of which indicate that an "establishment" for Section 13(a)(3) purposes is something that must be both a) "amusement or recreational," and b) in operation for fewer than eight months in a calendar year.

Ex. C at 1.)    In other words, the "establishment" at issue

here—as distinguished from the "enterprise" that operated and

controlled it—is defined by its discrete physical location.

Given the legislative history of the Section 13(a)(3)

exemption, the DOL's consistent interpretations of the statute,

and the plaintiff's own allegations, FanFest is an "amusement or

recreational establishment" that operated for fewer than eight

months in 2013.[10]


B.

For the foregoing reasons, the Complaint shows that the

plaintiff worked for an "amusement or recreational

establishment" that operated for fewer than eight months, and,

therefore, that the Section 13(a)(3) exemption applies.    This

defense has been established by the plaintiff's own pleadings,

which show that FanFest was an "establishment" as that term is

defined under the statute and the applicable regulations, and

that it operated for only a handful of days.    It is therefore

---

[10] For this reason, none of the allegations in the Complaint as
to the extent of MLB's year-round operations are of any
consequence.    (See, e.g., Am. Compl. ¶¶ 1 ("MLB staffed its
baseball operations throughout the year . . . ."), 147 ("MLB
begins recruiting volunteers for the next summer's All Star Week
events in October of the prior year."), 153 ("MLB's paid
workforce consists of at least 435 employees, all of whom work
year-round.").)

appropriate to grant the defendants' motion to dismiss the plaintiff's FLSA claims even at this early stage in the proceedings.[11]   Moreover, there is no occasion to reach the question of whether the plaintiff is an "employee" as that term is defined in Section 6 of the FLSA.


C.

In addition to his FLSA claims, the plaintiff has claimed that the defendants violated the NYLL by failing to pay him the appropriate minimum wage, failing to keep appropriate records

---

[11] In addition to a minimum wage claim under the FLSA, the plaintiff has brought a claim under FLSA § 11(c), 29 U.S.C. § 211(c), alleging MLB's failure to maintain records relating to his employment during All Star Week.  Section 11(c) requires employers to "make, keep, and preserve" certain employment records, as prescribed by DOL regulations.  29 U.S.C. § 211(c). In turn, DOL regulations require certain records to be kept even with respect to exempt employees.  See 29 C.F.R. § 516.11 (requiring records to be maintained regarding exempt employees' names, addresses, dates of birth, and sex).  However, the general consensus is that the FLSA provides no private right of action for recordkeeping violations.  See Elwell v. Univ. Hosps. Home Care Servs., 276 F.3d 832, 843 (6th Cir. 2002); Lopez v. Tri-State Drywall, Inc., 861 F. Supp. 2d 533, 536-37 (E.D. Pa. 2012) (collecting cases).  The parties did not provide their positions as to whether the FLSA contains a private right of action for recordkeeping violations, but, at oral argument, the plaintiff conceded that if his FLSA minimum wage claim is dismissed, he will no longer have a federal cause of action in this lawsuit.  (See Oral Arg. Tr. at 3-4.)  Accordingly, the FLSA recordkeeping claim must be dismissed.

related to his employment, and failing to provide him with the wage information that is required under New York law.  (See Am. Compl. ¶¶ 188-203.)

A district court may decline to exercise supplemental jurisdiction over state-law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).  When all federal claims are eliminated before trial, the balance of factors to be considered—including judicial economy, convenience, fairness, and comity—typically points towards declining to exercise supplemental jurisdiction over any remaining state-law claims.  Kolari v. N.Y.— Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006).  Having dismissed all of the claims over which this Court has original jurisdiction,[12] declining to exercise supplemental jurisdiction over the state-law claims is appropriate at this early stage in the litigation.  See, e.g., Elgendy v. City of New York, No. 99 Civ. 5196, 2000 WL 1119080, at *6 (S.D.N.Y. Aug. 7, 2000) (declining to exercise supplemental jurisdiction over state- and

_____

[12] This Court had subject-matter jurisdiction over the plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the NYLL claims pursuant to 28 U.S.C. § 1367(a).  There is no allegation in, or inference from, the Complaint that diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) exists in this action.  Accordingly, this Court does not have original jurisdiction over the NYLL claim.

city-law claims after granting the defendant's motion to dismiss the federal claims).  The Court therefore dismisses the plaintiff's NYLL claims without prejudice.


IV.

The plaintiff has moved for collective certification and court-authorized notice under FLSA Section 16(b).  Given that the plaintiff's claims are dismissed, the plaintiff's motion under Section 16(b) is denied as moot.


CONCLUSION

The Court has considered all of the arguments of the parties.  To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the foregoing reasons, the defendants' motion to dismiss the FLSA claims is **granted**.  The plaintiff's New York state-law claims are **dismissed without prejudice**.  The plaintiff's motion for collective certification and court-authorized notice is **denied as moot**.  The Clerk is directed to **close Docket Nos. 2 and 35**, to **enter judgment**, and to **close this case**.

**SO ORDERED.**

**Dated:    New York, New York
          March 25, 2014**              _____/s/_____
                                         **John G. Koeltl
                             United States District Judge**

27

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOHN CHEN, on behalf of himself and all others
similarly situated,

<small>(List the full name(s) of the plaintiff(s)/petitioner(s).)</small>

-against-

MAJOR LEAGUE BASEBALL PROPERTIES, INC.
and THE OFFICE OF THE COMMISSIONER OF
BASEBALL d/b/a MAJOR LEAGUE BASEBALL,

<small>(List the full name(s) of the defendant(s)/respondent(s).)</small>

<u>13</u> CV <u>5494</u> ( JGK)(    )

**NOTICE OF APPEAL**

Notice is hereby given that the following parties: <u>Plaintiff-Appellant John Chen,</u>

<u>on behalf of himself and all others similarly situated.</u>

<small>(list the names of all parties who are filing an appeal)</small>

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the    ■ judgment    ☐ order    entered on:    <u>March 26, 2014</u>

<small>(date that judgment or order was entered on docket)</small>

that:

<small>(If the appeal is from an order, provide a brief description above of the decision in the order.)</small>

<u>April 23, 2014</u>

<small>Dated</small>

Signature*

<u>Swartz, Justin M.</u>

<small>Name (Last, First, MI)</small>

<u>Outten & Golden LLP, 3 Park Ave., 29th Floor, New York, NY 10016</u>

<small>Address                                    City                    State                    Zip Code</small>

<u>(212) 245-1000</u>                                    <u>JMS@outtengolden.com</u>

<small>Telephone Number</small>                                    <small>E-mail Address (if available)</small>

---

<small>* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case. Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.</small>

<small>Rev. 12/23/13</small>