# No. 14-1315-cv

## In the United States Court of Appeals for the Second Circuit

———————————————

JOHN CHEN, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant*

v.

MAJOR LEAGUE BASEBALL PROPERTIES, INC., THE OFFICE OF THE COMMISSIONER OF BASEBALL, DBA MAJOR LEAGUE BASEBALL,

*Defendants-Appellees*,

MAJOR LEAGUE BASEBALL, MAJOR LEAGUE BASEBALL ENTERPRISES, INC.,

*Defendants*.

———————————————

On Appeal from the United States District Court
for the Southern District of New York
Case No. 13-cv-5494 (The Honorable John G. Koeltl)

———————————————

### BRIEF FOR PLAINTIFF-APPELLANT JOHN CHEN

———————————————

Justin M. Swartz
Juno Turner
Michael N. Litrownik
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, NY 10016
(212) 245-1000

Deepak Gupta
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ....................................................................3

STATEMENT OF THE ISSUES.........................................................................4

STATEMENT OF THE CASE AND OF THE FACTS ......................................4

I.    Statutory and regulatory background ........................................................5

    A.    The FLSA's seasonal exemption ............................................5

    B.    The retail exemption and the definition of "establishment"................7

    C.    The application of the definition to the seasonal exemption ...............9

II.    Facts and proceedings below.......................................................................11

    A.    The business of Major League Baseball..............................11

    B.    Baseball's labor practices ...................................................13

    C.    FanFest and John Chen's work for Major League Baseball ..............16

    D.    This lawsuit .........................................................................19

    E.    Major League Baseball's motion to dismiss .....................20

    F.    The district court's decision. ..............................................22

SUMMARY OF ARGUMENT...........................................................................23

STANDARDS OF REVIEW ..............................................................................24

ARGUMENT ......................................................................................................25

I.    Major League Baseball is not exempt from the Fair Labor Standards Act. ..........................................................................................................25

II.    FanFest is not a separate "establishment" from Major League Baseball ......28

A.   The Department of Labor uses a functional, fact-intensive, multi-prong inquiry to determine what constitutes a seasonal "establishment"—not a rigid location-only test. ..................................28

B.   The district court failed to apply the proper test, which Major League Baseball cannot satisfy on this record. ...................................34

C.   FanFest is a convention, not a separate establishment. .....................36

III.   At a minimum, a remand is required to develop the facts necessary to determine the appropriate level of generality at which to assess the claimed exemption. ......................................................................38

CONCLUSION ................................................................................42

# TABLE OF AUTHORITIES

## Cases

*A.H. Phillips, Inc. v. Walling,*
  324 U.S. 490 (1945) ...................................................................2, 7

*Adams v. Detroit Tigers, Inc.,*
  961 F. Supp. 176 (E.D. Mich. 1997).......................................33

*Archuleta v. Wal-Mart Stores, Inc.,*
  543 F.3d 1226 (10th Cir. 2008) ...............................25, 39, 41

*Arnold v. Ben Kanowsky, Inc.,*
  361 U.S. 388 (1960) ......................................................................24

*Bilyou v. Dutchess Beer Distribs. Inc.,*
  300 F.3d 217 (2d Cir. 2002)......................................................25

*Brennan v. Goose Creek Consolidated Independent School District,*
  519 F.2d 53 (5th Cir. 1975) ...............................................31, 33

*Bridewell v. Cincinnati Reds,*
  155 F.3d 828 (6th Cir. 1998) ....................................................27

*Bridewell v. Cincinnati Reds,*
  68 F.3d 136 (6th Cir. 1995) ....................................14, 32, 33

*Davis v. J.P. Morgan Chase & Co.,*
  587 F.3d 529 (2d Cir. 2009)..................................................3, 24

*Fast v. Applebee's International, Inc.,*
  638 F.3d 872 (8th Cir. 2011) ....................................................35

*Federal Baseball Club v. National League,*
  259 U.S. 200 (1922) ........................................................................1

*Flood v. Kuhn,*
  407 U.S. 258 (1972)..................................................1, 23, 26

*Frasier v. Gen. Elec. Co.,*
  930 F.2d 1004 (2d Cir. 1991)....................................................39

*Gagnon v. United Technisource, Inc.*,
   607 F.3d 1036 (5th Cir. 2010) ................................................................37

*Gualandi v. Adams*,
   687 F.3d 554 (2d Cir. 2012) ..................................................................32

*Hamilton v. Tulsa County Pub. Facilities Auth.*,
   85 F.3d 494 (10th Cir. 1996) ...........................................................26, 41

*Herman v. Collis Foods, Inc.*,
   176 F.3d 912 (6th Cir. 1999) ................................................................37

*Iowa Public Employees' Retirement System v. MF Global, Ltd.*,
   620 F.3d 137 (2d Cir. 2010) ..................................................................25

*Jeffery v. Sarasota White Sox, Inc.*,
   64 F.3d 590 (11th Cir. 1995) ...........................................................26, 34

*Keiler v. Harlequin Enterprises Ltd.*,
   751 F.3d 64 (2d Cir. 2014) ...................................................................24

*Liger v. New Orleans Hornets NBA Limited Partnership*,
   565 F. Supp. 2d 680 (E.D. La. 2008) ...................................................27

*Lundy v. Catholic Health Sys. of Long Island Inc.*,
   711 F.3d 106 (2d Cir. 2013) .................................................................24

*Marshall v. New Hampshire Jockey Club*,
   562 F.2d 1323 (1st Cir. 1977) .......................................26, 29, 30, 40

*McLaughlin v. Boston Harbor Cruise Lines, Inc.*,
   419 F.3d 47 (1st Cir. 2005) ...........................................................25, 36, 39

*Mitchell v. Gammill*,
   245 F.2d 207 (5th Cir. 1957) ...............................................................33

*Newman v. Advanced Technology Innovation Corp.*,
   749 F.3d 33 (1st Cir. 2014) ..................................................................37

*Reich v. Delcorp, Inc.*,
   3 F.3d 1181 (8th Cir. 1993) ...................................................................8

*Reich v. S. New Eng. Telecomms. Corp.*,
    121 F.3d 58 (2d Cir. 1997)....................................................................39

*Schechter v. Comptroller of City of New York*,
    79 F.3d 265 (2d Cir. 1996)..................................................................21

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)............................................................................22

*Wirtz v. Campus Chefs, Inc.*,
    303 F. Supp. 1112 (N.D. Ga. 1968)...................................................33

**Statutes and Rules**

28 U.S.C. § 1291 ....................................................................................4

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1337 ....................................................................................3

Fair Labor Standards Act

    29 U.S.C. § 206 ...............................................................................5

    29 U.S.C. § 207(i) ...........................................................................8

    29 U.S.C. § 207(o) ..........................................................................5

    29 U.S.C. § 213(a)(1) ......................................................................5

    29 U.S.C. § 213(a)(3)................................................................1, 5, 26

Federal Rule of Civil Procedure 12(b)(6) .......................................24, 39

NYLL Article 6 §§ 190 et seq.............................................................20

NYLL Article 19 §§ 650 et seq...........................................................20

**Legislative History**

President Franklin D. Roosevelt, Message to Congress, May 24, 1937 ...................5

S. Rep. No. 75-884 (1937) ....................................................................7

## Regulatory Materials

29 C.F.R. § 779 ............................................................................22, 29

29 C.F.R. § 779.23 ......................................................................2, 7, 28

29 C.F.R. § 779.303 .......................................................................7, 31

29 C.F.R. § 779.304 .......................................................................8, 31

29 C.F.R. § 779.305 ...................................................................8, 30, 31

Dept. of Labor, Wage and Hour Division,
*Field Operations Handbook* (1994) ............................................ *passim*

Dept. of Labor, Opinion Letter No. FLSA2001–15, 2001 WL
1869964 (May 19, 2001) .............................................................9

Dept. of Labor, Opinion Letter, 1999 WL 1788159 (Sept. 22, 1999) ........10, 31, 36

Dept. of Labor, Opinion Letter, FLSA2003-1, 2003 WL 23374597
(Mar. 17, 2003) .........................................................................26

Dept. of Labor, Opinion Letter, FLSA2004-6NA, 2004 WL 5303034
(Aug. 4, 2004) ..................................................................... *passim*

Dept. of Labor, Opinion Letter, FLSA2009-11, 2009 WL 1788159
(Jan. 15, 2009) .........................................................................31

## Books and Articles

Stuart Banner, *The Baseball Trust: A History of Baseball's Antitrust
Exemption* (2013) ......................................................................14

John Bloom, *A House of Cards: Baseball Card Collecting and Popular Culture*
(1997) ........................................................................................18

Dan Good, *Topps Gives MLB Fan Fest Attendees Exclusive Cards and A
Figurine*, Beckett News, July 13, 2013 .......................................19

Frank P. Jozsa, *Baseball, Inc: The National Pastime as Big Business* (2006) ...................11

Myron Levin & Stuart Silverstein, *Federal probe into Major League Baseball
for illegal pay practices expands*, Salon, May 25, 2014 ................15

Myron Levin & Stuart Silverstein, *Labor Department Investigating Pay Practices of 2 Major League Baseball Teams*, FairWarning, Oct. 24, 2013.................15

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2004)................................37

*New Oxford American Dictionary* (3rd ed. 2010)............................................37

Larry Moffi, *The Conscience of the Game: Baseball Commissioners from Landis to Selig* (2006)........................................................................................12

Mary Pilon, *Finding Economic Lessons in Fading Era of Card Shows*, N.Y. Times, Apr. 21, 2012...........................................................................18

Linda E. Swayne & Mark Dodds, *Encyclopedia of Sports Management and Marketing* (2011)............................................................................18

Elizabeth Warmerdam, *Minor League Ballplayers Sue Baseball in Labor-Antitrust Class Action*, Courthouse News Service, Jul. 23, 2014 ......................15, 16

Andrew Zimbalist, *Baseball and Billions: A Probing Look Inside the Big Business of Our National Pastime* (1994) ................................................12

## Miscellaneous

Memo, Office of the Commissioner of Baseball, Sept. 12, 2013............................15

# INTRODUCTION

This appeal concerns whether Major League Baseball may escape the Fair Labor Standards Act's wage-and-hour requirements for employees who work on its far-flung broadcasting, licensing, and marketing activities held throughout the year.

Baseball may have an antitrust exemption, but it is not—and should not be—exempt from labor standards that apply to employers across the board. Whatever may have been true in 1922, when Justice Holmes deemed it neither "trade" nor "commerce," *Federal Baseball Club v. National League*, 259 U.S. 200, 209 (1922), professional baseball today is big business—a multi-billion-dollar global media and merchandising behemoth. And because of its antitrust exemption, Major League Baseball maintains a unique, controlling relationship over its labor market—a market with a longstanding "proclivity to predatory practices." *Flood v. Kuhn*, 407 U.S. 258, 287 (1972) (Douglas, J., dissenting). As Major League Baseball itself acknowledged last year, the Department of Labor has found that wage-and-hour violations "are endemic to [the] industry," and has recently initiated investigations into baseball's use of unpaid interns and misclassification of employees.

In this case, Major League Baseball has sought refuge in the FLSA's exemption for seasonal "amusement or recreational establishment[s]." 29 U.S.C. § 213(a)(3). It does not argue that Major League Baseball itself qualifies for this

1

exemption (which was enacted to facilitate employment for teenagers at summer camps and other small seasonal employers). That would be impossible; the exemption requires *seasonal* operations, and the League's many operations extend year-round. Instead, Major League Baseball contended below and the district court agreed that the "MLB FanFest" at which plaintiff John Chen worked—a convention for baseball fans lasting several days—was a separately exempt "establishment" of its own.

The district court reached that conclusion by mechanically applying a regulation defining "establishment" as "a distinct physical place of business," like a store in a retail chain. 29 C.F.R. § 779.23. But the word is not a term of art; "Congress used the word 'establishment' as it is normally used in business and in government—as meaning a distinct physical place of business." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945). And the district court disregarded the functional test that the Department has repeatedly followed in defining "establishment" for purposes of the seasonal exemption. Under that test, physical location is not given dispositive significance. Instead, the entity must establish "(a) physical separation from other activities, (b) functional operation as a separate unit with separate records and separate bookkeeping[,] and (c) no interchange of employees between the units." Dept. of Labor, Opinion Letter, FLSA2004-6NA, 2004 WL 5303034, at *2 (Aug. 4, 2004) (2004 Opinion Letter). The district court failed to consider all but

the first factor, and Major League Baseball cannot satisfy the remaining factors on this record. Indeed, the Department has specifically determined in its Field Operations Handbook that an amusement or recreation "convention" is "not considered an exempt establishment." That interpretation warrants deference.

Allowing a defendant to characterize every transient event as a separate "establishment" would open up a gaping hole in the FLSA's coverage, exempting each one as a "seasonal" business. That prospect is troubling enough given baseball's checkered labor-relations record. But the implications would go further still—sweeping in janitors, traveling performers, stagehands, and a wide variety of other workers not intended to be covered.

Given the fact-intensive nature of the question, such a drastic decision should not have been made on the bare pleadings. FLSA exemptions "are to be narrowly construed against the employers seeking to assert them" and "limited to those establishments plainly and unmistakably within their terms and spirit." *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531 (2d Cir. 2009). At a minimum, because the seasonal exemption does not "plainly and unmistakably" apply here, this case should be remanded to allow development of the facts.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 over the plaintiff John Chen's federal claims under the FLSA, 29 U.S.C.

§§ 201 et seq. The district court entered final judgment dismissing his federal claims on March 26, 2014. Chen timely filed a notice of appeal under Federal Rule of Appellate Procedure 4(a)(1)(A) on April 23, 2014. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Is Major League Baseball exempt from the Fair Labor Standards Act?

2.    Even if Major League Baseball itself is not exempt, may it nevertheless escape FLSA coverage by characterizing "FanFest"—a convention for baseball fans that lasted several days—as a separate "establishment" for purposes of the Act's exemption for seasonal "amusement or recreational establishment[s]"?

3.    At a minimum, is a remand required to develop facts, beyond the bare pleadings, that are necessary to determine the appropriate level of generality at which to assess the claimed FLSA exemption?

## STATEMENT OF THE CASE AND OF THE FACTS

John Chen worked for Major League Baseball at FanFest, a promotional event for the League's All-Star Game, in June and July 2013. This appeal arises out of the district court's dismissal of Chen's suit against Major League Baseball, in which he alleged that it violated FLSA by failing to pay him the minimum wage. The district court held, on the basis of the pleadings alone, that FanFest is exempt from the Act's minimum-wage and overtime requirements because it is "an

4

establishment which is an amusement or recreational establishment" that "does not operate for more than seven months in any calendar year." 29 U.S.C. § 213(a)(3).

## I.     Statutory and Regulatory Background

Congress enacted the Fair Labor Standards Act in 1938 "to extend the frontiers of social progress by insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." President Franklin D. Roosevelt, Message to Congress, May 24, 1937. The Act was designed to guarantee "minimum standards of health and well-being" for American workers, and to "serve as a source of protection to employers who pay a decent wage." *Id.* Among other things, it sets a minimum wage and mandates a higher overtime rate for any hours worked above the weekly maximum. 29 U.S.C. §§ 206–07.

The FLSA contains several exemptions. Some are based on the nature of the employer; others on the employee. One employee-based exemption, for example, excludes employees in a "bona fide executive, administrative, or professional" capacity. *Id.* § 213(a)(1). And one employer-based exemption, for example, excludes state and local public agencies from the overtime requirement, instead allowing them to offer compensatory time off. *Id.* § 207(o).

## A.     The FLSA's Seasonal Exemption

The seasonal-amusement-and-recreation exemption is an employer-based exemption. *See id.* § 213(a)(3). For qualifying employers, the minimum-wage and

5

overtime requirements do not apply to "any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center," if either that "amusement or recreational establishment" "(A) does not operate for more than seven months in any calendar year"; or (B) during the preceding year, its "average receipts" for the six-month off-season were less than one-third of its "average receipts" for its six-month on-season. *See id.*

The seasonal exemption was first introduced in 1961, in substantially different form. Originally, the exemption encompassed most retail or service stores, as well as hospitals and schools. As the Act was repeatedly expanded to cover nearly all employers (including hospitals, schools, and retail establishments), the exemption remained in place to ensure that state fairs and similar amusement parks could employ "high school and college students, schoolteachers, and other supplemental wage earners who are not in the labor market . . . during the summer." *Legis. History of the Fair Labor Standards Amendments of 1977* at 549–50 (1977) (statement of Sen. Helms) (*1977 Leg. Hist.*).[1]

---

[1] During the one time this exemption was expanded Congress continued to emphasize its narrowness. In 1977, Senator Helms introduced an amendment to clarify that "organized camp[s], or religious or non-profit educational conference center[s]" were included, but he reassured his colleagues that the new language "is no more broad than the terms" of the original exemption. *Id.* at 553.

6

**B.    The    Retail    Exemption    and    the    Definition    of    "Establishment"**

The FLSA's separate retail exemption was once codified with the seasonal exemption. Initially, Congress exempted small, local retail establishments—even the local branches of chain stores—from the FLSA because they were thought insufficiently involved in interstate commerce. S. Rep. No. 75-884, at 5 (1937). In interpreting the retail exemption, the Supreme Court observed that "Congress used the word 'establishment' as it is normally used in business and in government—as meaning a distinct physical place of business." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (distinguishing between retail store and wholesale operations).

In 1970, the Department of Labor adopted the Supreme Court's formulation when it released a cluster of regulations interpreting the word "establishment." One regulation uses the Court's language verbatim, simply defining "establishment" as a "distinct physical place of business." 29 C.F.R. § 779.23. Another explains that an "enterprise" may consist of a single "establishment" or of multiple "establishments." *Id.* § 779.303. The quintessential example is a chain store: Each branch is an "establishment"; together, the entire corporate entity is an "enterprise." For a store that is not part of a chain with multiple retail locations, the only relevant unit is the entire entity, which is both the "establishment" and the "enterprise." An additional regulation provides

7

illustrations, noting that a bakery, for example, that produces "goods in a backroom" and sells them in the "front room" is one establishment, even though the employees performing these "functions" are "separated by a partition" or a wall. *Id.* § 779.304.

Yet another regulation provides additional guidance on when to treat a subunit of a business as a separate establishment. That question primarily arises when multiple establishments operate in the same location, but it is not limited to that scenario. To be separate establishments, "physical separation is a prerequisite," but it is not sufficient. In addition, the establishments must also be "functionally operated as . . . separate unit[s]" with "separate records[] and separate bookkeeping" and have "no interchange of employees." *Id.* § 779.305.

In 1989, Congress eliminated retail establishments' exemption from wage-and-hour requirements, leaving a narrower exemption from the overtime requirement only for employees who are paid one-and-a-half times the minimum wage, and who make more than half of their compensation from commissions. 29 U.S.C. § 207(i); H.R. Rep. 10-260, pt. 1 at 49 (1989). Courts have been unwilling, "[a]bsent specific Congressional intent," to "conclude that Congress retained the term 'retail or service establishment'" but "discarded thirty years of established meaning." *Reich v. Delcorp, Inc.*, 3 F.3d 1181, 1183 (8th Cir. 1993).

### C. The Application of the Definition to the Seasonal Exemption

In carrying this definition of "establishment" over to the seasonal exemption, the Department has shown a sensitivity to the facts and the differences between the two exemptions. In some cases, the Department simply analyzes whether the seasonal exemption applies to the entire corporate entity. For example, in a 2001 Opinion Letter, the Department applied the exemption to the Salt Lake Organizing Committee for the Winter Olympics, expressing its opinion that the entire Organizing Committee (rather than specific events or sports arenas) fell within the exemption. *See* Dept. of Labor, Opinion Letter, FLSA2001–15, 2001 WL 1869964 at *1 (May 19, 2001).

In other cases, like this one, the question is more specific: When can a subunit of an entity itself qualify for the seasonal exemption as a separate recreation "establishment"? To help answer this question, the Department has announced a functional test that requires at least three indicia of separateness:

(a) physical separation from other activities,

(b) functional operation as a separate unit with separate records and separate bookkeeping, and

(c) no interchange of employees between the units.

2004 Opinion Letter, 2004 WL 5303034, at *2. Each requirement must be satisfied. *Id.* For example, the Department determined that a summer camp was not a

9

separate establishment from its year-round horseback riding stable, and therefore could not fit within the seasonal exemption. *Id.* at *1. Although the stable and the camp had separate records and bookkeeping, they did not demonstrate a sufficient lack of "interchange of employees between the units." *Id.* at *2. The Department also considers other factors, including whether the units are "economically independent of one another." Dept. of Labor, Opinion Letter, 1999 WL 1788159, at *1 (Sept. 22, 1999) (1999 Opinion Letter).

In practice, this multi-prong test requires a careful consideration of all relevant circumstances. For example, each one of the permanent base camps operated by a non-profit camping organization may be deemed a separate "establishment" within the meaning of the exemption, but the transient hiking or canoeing expeditions that originate from each of those camps are *not* establishments. *See* Dept. of Labor, Opinion Letter, FLSA2006-37, 2006 WL 3227792, at *1–2 (Sept. 28, 2006). Although each expedition is a subunit with a "distinct physical location," each trip is not a subunit that qualifies as an establishment—expeditions are not "functional units" with "separate bookkeeping" and would necessarily have "interchange of employees" with the basecamp staff.

The Department's Handbook similarly draws context-sensitive lines to determine whether the exemption should be applied to the whole corporate entity or only to a subunit. Dept. of Labor, *Field Operations Handbook*, Ch. 25 §§ 25j00–

10

25j17 (*DOL Handbook*). At "resort hotels," which are not generally within the exemption, "particular facilit[ies]" such as "golf course[s] or swimming pool[s]" are qualifying subunits that could, depending on the facts, be eligible for the exemption. *Id*. § 25j03. But for riverboat companies, the "riverboat[], docking, and ticketing facilities" must be evaluated as one unit; the riverboat alone is not a subunit that qualifies as an "establishment." *Id*. § 25j17.

Consistent with this approach, the DOL Handbook specifically determines that amusement-and-recreation "conventions," which typically do not entail an enduring physical structure or function as separate businesses and which are often staffed by employees of the host organization, do not come within the exemption, "as a convention is not considered an exempt establishment." *Id*. § 25j05.

## II.   Facts and Proceedings Below

### A.   The Business of Major League Baseball

From its humble origins in the ragtag Cincinnati Red Stockings of 1869, Major League Baseball has grown to become not only a beloved national pastime but a billion-dollar global sports and media conglomerate.[2] *See generally* Frank P. Jozsa, *Baseball, Inc: The National Pastime as Big Business* (2006); Andrew Zimbalist,

---

[2] The first professional team was arguably the Philadelphia Athletics, which began surreptitiously paying players in 1868. Mitchell Nathanson, *A People's History of Baseball* 10 (2012). But at the time, teams adhered to the image of "amateur" baseball, and the players were members of a national amateur players association. *Id*. at 11. The Red Stockings were the "first openly professional team." *Id*.

*Baseball and Billions: A Probing Look Inside the Big Business of Our National Pastime* (1994). Last year alone, Major League Baseball earned $7 billion, hosted 74 million spectators at live games (more than any other sports league), and broadcast one of its games—Game Six of the World Series—to nearly 20 million television viewers.[3]

Known formally as the Office of the Commissioner, Major League Baseball is an unincorporated association comprised of thirty teams. Larry Moffi, *The Conscience of the Game: Baseball Commissioners from Landis to Selig* 224 (2006) (quoting Major League Const.). Since 2000, it has encompassed both the American and National Leagues. Zimbalist, *Baseball and Billions*, at 7–8. The office has, among other things, "executive responsibility for labor relations." Moffi, *Baseball Commissioners*, at 102.

Major League Baseball itself employs at least 435 full-time workers year-round, most of whom "are involved in marketing [and] licensing" in various forms at its headquarters on Park Avenue. *Id.* at 101; A-10 (Am. Compl. ¶ 6). These employees also oversee a wide range of activities year-round, including the All-Star Game, the Home Run Derby, the World Series, the Baseball Hall of Fame, and more. In conjunction with the International Baseball Federation, they also run the

---

[3] A-33 (Am. Compl. ¶ 153); MLB Press Release, *Playoff Television Viewership Up 20 Percent*, Oct. 31, 2013, *available at* http://perma.cc/NC37-AW74; MLB Press Release, *MLB Finishes 2013 with Sixth Best Attendance Total Ever; Last Decade Includes 10 Best-Attended Individual Seasons in MLB History*, Oct. 1, 2013, *available at* http://perma.cc/5FEY-UQ7P.

World Baseball Classic, which in 2014 includes sixteen countries competing in thirty-nine games.

In addition, Major League Baseball has multiple agent corporations, including MLB Properties, Inc., MLB Network, and MLB Advanced Media, which handle marketing, broadcasting rights, product licensing, contracts with umpires, physical properties, and team websites. One of these agent corporations is Minor League Baseball, through which the Commissioner standardizes contracts for minor league teams to affiliate with major league teams, as well as a standard employment contract for all minor league players.[4] For the far younger major-league hopefuls—middle- and high-schoolers—Major League Baseball operates Urban Youth Academies across the country.[5]

### B.    Baseball's Labor Practices

Major League Baseball's unique control over its sports and business empire is possible in part because of its controversial exemption from the antitrust laws. *See Federal Baseball Club v. National League*, 259 U.S. 200 (1922); *Flood v. Kuhn,* 407 U.S. 258 (1972). This allows baseball to control its labor market—the market for players and employees—beyond that of other businesses, or even other sports leagues. *See*

---

[4] *See* Major League Rules, Rule 2, 3(b), 4, & Attachment 3, (2008) *available at* http://perma.cc/83UG-PYUW.

[5] *See* MLB Urban Youth Academy, About Us, *available at* http://perma.cc/6R4N-KNCZ.

13

Stuart Banner, *The Baseball Trust: A History of Baseball's Antitrust Exemption* xii (2013). Baseball's quest for the exemption grew out of a specific labor practice in the late 1800s: "reserve clauses," under which a baseball team "reserved" a player for several years after his contract expired. *Id.* at 1–8. The contracts worked if all the other teams complied—and the League's lawyers worked to ensure that the teams could openly collude with one another and that rival leagues were quashed. *Id.* at 1–35.[6]

While the antitrust exemption has exacerbated the labor exploitation that has plagued America's pastime for over a century, federal law does not leave baseball to its own devices. The federal wage-and-hour laws still apply. *See, e.g.*, *Bridewell v. Cincinnati Reds*, 68 F.3d 136 (6th Cir. 1995), *cert. denied*, 516 U.S. 1172 (1996). Invoking that authority, the federal government has closely scrutinized Major League Baseball's labor practices over the past year.

In a September 2013 memo, the Office of the Commissioner relayed to each team that the Department of Labor was concerned that wage-and-hour violations

---

[6] *See also Flood*, 407 U.S. at 289 (Marshall, J., dissenting) ("To non-athletes it might appear that petitioner was virtually enslaved by the owners of major league baseball clubs who bartered among themselves for his services. But, athletes know that it was not servitude that bound petitioner to the club owners; it was the reserve system. The essence of that system is that a player is bound to the club with which he first signs a contract for the rest of his playing days. He cannot escape from the club except by retiring, and he cannot prevent the club from assigning his contract to any other club.").

"are endemic to [the] industry." Memo, Office of the Comm'r. of Baseball, Sept. 12, 2013, *available at* http://perma.cc/KA5H-ZKNT. According to the memo, the Department noted that it will likely consider unpaid jobs as "employment positions subject to FLSA's minimum wage and overtime requirements." *Id.*; *see also* Myron Levin & Stuart Silverstein, *Federal probe into Major League Baseball for illegal pay practices expands*, Salon, May 25, 2014, *available at* http://perma.cc/UM66-U7M6.

Shortly after that memo, the Department reached a settlement with the San Francisco Giants and the Miami Marlins (both major league teams) over wage-and-hour violations. *See* Myron Levin & Stuart Silverstein, *Labor Department Investigating Pay Practices of 2 Major League Baseball Teams*, FairWarning, Oct. 24, 2013, *available at* http://perma.cc/MEH2-5CM3. The settlement reportedly addressed unpaid interns who were due minimum wages under the FLSA. *Id.* In August 2013, the Giants reached a different settlement with the Department after paying wages to 74 employees. *Id.* That settlement involved workers who were paid $55 per day—less than the minimum wage, and without the required overtime pay. *Id.* In another settlement in June, the Giants paid $500,000 in back wages to security guards who had been denied overtime. *Id.*

More recently, minor league players filed a class-action lawsuit against Major League Baseball. *See* Elizabeth Warmerdam, *Minor League Ballplayers Sue Baseball in Labor-Antitrust Class Action*, Courthouse News Service, Jul. 23, 2014,

15

*available at* http://perma.cc/TR6F-YN4K. The players allege that under their contract with Major League Baseball, they earn less than the FLSA-required minimum wage and overtime for their 50–70 hour weeks. Reminiscent of the old "reserve clauses," the uniform minor league contracts specify that the players may not retire, play for another minor league team, or play for a foreign team in a different league, without permission from Major League Baseball. *Id.*

## C.    FanFest and John Chen's Work for Major League Baseball

Major League Baseball operates many promotional events open to the public. Every June or July, near the time of the All-Star Game, Major League Baseball operates a series of events, including a fan festival (known as "FanFest"), a 5-kilometer race, a concert, a fantasy camp, a parade, and other promotional activities. A-9–10 (Am. Compl. ¶¶ 1–3). Major League Baseball staffs these events, which take place throughout each host city, with unpaid workers. A-10 (¶ 3). It also stations unpaid workers at hotels and other key locations around the city to direct fans to events. A-14 (¶¶ 25–26). Instead of wages in cash, Major League Baseball compensates these workers with admission to FanFest and with baseball memorabilia, such as a water bottle and a baseball cap. A-10 (¶ 6). Major League Baseball also employs sanitation workers, known as "Green Teams," who collect garbage and encourage recycling at ballparks around the country, as well as at the

All-Star Game and the World Series. A-9, 17, 24 (¶¶ 2–3, 7, 42, 98). These workers are also compensated with memorabilia (like t-shirts) rather than money. A-9 (¶ 7).

Workers at the 2013 FanFest and at other All-Star Game events collected tickets at the entrance to the events, directed customers to hotels, answered customers' questions about the schedule, communicated with bus dispatchers, managed crowds boarding buses, ensured Major League Baseball-chartered buses ran on time, checked press credentials, and ensured that the press remained in the designated areas. A-30 (¶¶ 124–136).

In 2008 and 2013, the All-Star Game, FanFest, the 5-kilometer race, the concert, the fantasy camp, and parade took place throughout New York City. A-15, 20–21 (¶¶ 34, 77). Plaintiff John Chen was one of approximately 2,000 New Yorkers who worked at the events leading up to the 2013 All-Star Game; he worked at the FanFest at Jacob K. Javits Convention Center in Manhattan in June and July. A-18 (¶ 50). Before starting his work at FanFest, Chen attended two training sessions (one in June in Queens, another in July in Manhattan) and underwent a background check. A-16, 18, 34 (¶¶ 41, 50, 159–160). At FanFest, Chen performed a variety of tasks during his shifts. He staffed the entrance to FanFest, which involved having each customer sign a liability waiver, stamping each customer's hand after they signed the waiver, distributing promotional goods to each customer, and ensuring customers did not exit through the entrance door.

17

A-34–35 (¶¶ 164–167). Later, Chen sat in a back room and alphabetized the waivers signed by customers. A-35 (¶ 171). He also stuffed flyers into promotional bags that would be distributed to customers. A-35 (¶ 168). As payment, he received a fanny pack, a baseball, and two tickets to FanFest, but no wages. A-16 (¶ 39).

A "FanFest" is, in marketing terms, "a promotional event" that is "designed to emphasize the importance of the sport fan to the sport industry" and to "promote social facilitation" and "mingling" with other fans and "current or former athletes." Linda E. Swayne & Mark Dodds, *Encyclopedia of Sports Management and Marketing* 525–26 (2011). The Major League Baseball FanFest each year includes museum exhibits from the National Baseball Hall of Fame, free autographs from "Major League Baseball legends," and a "collectors showcase" where fans can buy, sell, and trade baseball cards. A-14 (Am. Compl. ¶¶ 27–28); *see also* MLB FanFest Attractions, 2013, *available at* http://perma.cc/NE9E-PD7W.

Baseball card conventions like these have a solid place in American cultural history. *See* John Bloom, *A House of Cards: Baseball Card Collecting and Popular Culture* 78–82 (1997). They rose in popularity in the 1970s and '80s, when card dealers would "lug[] tens of thousands" of dollars worth of cards across the country to sell at the larger conventions. Mary Pilon, *Finding Economic Lessons in Fading Era of Card Shows*, N.Y. Times, Apr. 21, 2012. From 1989 to 1997, there were more than 50,000 such conventions across the country. *Id.* Today, baseball-card collectors rely

on the Internet—but FanFest is an exception: at the 2008 FanFest, "baseball card dealers . . . came from all over the country," including one man who had "been in the baseball card business since 1974" who brought "more than a million cards." Joshua Robinson, *At FanFest, Sensory Experience Includes a Touch of Nostalgia*, N.Y. Times, July 12, 2008. At the 2008 FanFest, the biggest fan favorites were cards of the Rangers' Josh Hamilton and the Yankees' Joba Chamberlain, along with classic collectible cards from the 1920s and 1950s Yankees' roster. *Id.* At the 2013 FanFest, the famed baseball-card maker Topps released a special edition six-card set for attendees only. Dan Good, *Topps Gives MLB Fan Fest Attendees Exclusive Cards and A Figurine*, Beckett News, July 13, 2013.

### D.     This Lawsuit

Following FanFest, Chen sought to remedy Major League Baseball's FLSA violations. He filed suit on behalf of himself and other similarly situated people who provided unpaid labor to the League in New York. A-17, 20–21 (Am. Compl. ¶¶ 47, 77). This included all unpaid workers at the 2008 and 2013 baseball events New York City. A-20–21 (¶ 77). Chen alleged that he was employed by Major League Baseball within the meaning of the FLSA, and that Major League Baseball is subject to the FLSA. A-36 (¶¶ 177–78); *see* 29 U.S.C. §§ 203(e), (g), (m), (r), (2), 206(a). He also alleged that Major League Baseball failed to keep the required records of his employment. A-37 (Am. Compl. ¶ 187); 29 U.S.C. § 211(c).

19

Chen brought analogous claims under New York's Labor Law (NYLL). A-17 (Am. Compl. ¶ 48). The NYLL contains minimum-wage, overtime, and recordkeeping requirements parallel to those in the FLSA. *See* NYLL §§ 190 et seq., §§ 650 et seq. Chen alleged that Major League Baseball did not pay the required minimum wage under NYLL and did not keep (or provide him with) appropriate records. A-37–38 (Am. Compl. ¶¶ 188–195); NYLL §§ 190, 195(1)–(4), 651(5), 652, 661. Ultimately, Chen sought unpaid minimum wages and statutory damages as authorized by both the FLSA and NYLL. A-40 (Am. Compl. ¶¶ D–C).

### E.    Major League Baseball's Motion to Dismiss

Major League Baseball moved to dismiss the lawsuit on two grounds. First, it argued that there are no possible facts Chen could plead that would qualify him as an employee of the League. Def's Mtn. to Dismiss 8. Major League Baseball argued that, although it is a for-profit corporation, it is able to accept unpaid labor under both the FLSA and NYLL as long as the workers do not anticipate receiving any compensation. *Id.* at 8–9. And it argued Chen had no such expectation of compensation. *Id.* at 11–13.

Second, Major League Baseball argued that all of its events, including those related to the All-Star Game and World Series, are exempt from the FLSA under the seasonal-amusement-and-recreation exemption, and that there are no possible facts that could demonstrate otherwise. *Id.* at 18. To support this theory, Major

League Baseball relied exclusively on the general definition of "establishment" and argued that each All-Star-week event—FanFest, the parade, the 5-kilometer race, and so on—is a separate seasonal "establishment" and thus exempt. *Id.* at 20. Further, each World Series game and each stadium where "Green Team" workers provide sanitation services is also, in the League's view, a distinct "establishment" within the exemption. *Id.* at 20–21.

Chen responded by arguing that he was an employee of Major League Baseball, which didn't meet its burden to prove that it is exempt under the seasonal exemption. First, Chen argued that he and the other class members are employees within the FLSA and NYLL, because there is no "volunteer" exemption within those laws. Plaintiff's Opp. 1. Although expectation of benefit does not determine whether unpaid labor can be accepted, Chen and the class members did expect compensation from Major League Baseball and received it—in the form of in-kind benefits such as tickets to FanFest, t-shirts, and baseball caps. *Id.* at 3, 10–11. These in-kind benefits, he argued, did not comply with the applicable minimum-wage and overtime requirements.

Second, Chen argued that Major League Baseball didn't meet its burden in asserting the seasonal exemption as an affirmative defense, which must be "supported by specifically pled facts." *Id.* at 16 (citing *Schechter v. Comptroller of City of New York*, 79 F.3d 265, 270 (2d Cir. 1996)).

## F.     The District Court's Decision

The district court granted Major League Baseball's motion to dismiss, relying on the seasonal exemption. First, the court held that the Department of Labor's regulation defining establishment, 29 C.F.R. § 779.23, receives only *Skidmore* deference as an "interpretive rule." A-57 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The district court did not cite or discuss the Labor Department's Field Operations Handbook or other Department interpretive materials. Instead, the court applied the regulation's definition of "establishment" as a distinct physical place of business and concluded that FanFest is a separate "establishment" from Major League Baseball. A-51–58.

Second, based only on the pleadings, the district court held that FanFest, as an establishment, falls within the exemption because it is an "amusement or recreation establishment" and operates for not more than seven months during the year. A-52–56.

The district court did not reach the question of whether Chen was an "employee" within the meaning of the FLSA. A-67. It also dismissed the NYLL claims without prejudice, declining to exercise supplemental jurisdiction. A-69.

22

## SUMMARY OF ARGUMENT

**I.** Major League Baseball does not enjoy an exemption from the Fair Labor Standards Act akin to its antitrust exemption. It also cannot qualify as an exempt seasonal "amusement or recreational establishment." Baseball has a season, but it's far from a seasonal establishment—its far-flung activities last the whole year.

**II.A.** Nor may Major League Baseball remove its employees from the Act's coverage for work they perform at events like FanFest, on the theory that each event is a distinct physical place of business. Adopting this physical-location-only test, the district court held that FanFest—a convention for baseball fans—was an exempt "establishment." But that approach ignores the Department of Labor's own test, the exemption's purpose, and the case law. It's also unworkable, and produces absurd results.

**B.** Under the Department's actual, functional test, Major League Baseball must prove—with affirmative evidence—that each of its events is not just physically separate from its other activities, but also functions "as a separate unit with separate records and separate bookkeeping" and does not have any overlap of "employees between the units." 2004 Opinion Letter, at *2. This Major League Baseball cannot do.

**C.** The district court's holding also cannot be reconciled with the Department's interpretation, in the Wage and Hour Division's Field Operations

23

Handbook, that a recreational "convention is not considered an exempt establishment."

**III.** At a minimum, a remand is required to develop the facts. Did FanFest function as a separate business unit? Did it have separate records and keep separate books? How many Major League Baseball central-office employees worked at FanFest? Without answers, Major League Baseball cannot come close to meeting the exemption—let alone "plainly and unmistakably." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

## STANDARDS OF REVIEW

This Court reviews de novo the dismissal of a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 68 (2d Cir. 2014). A tie goes to the runner: This Court "accept[s] all factual allegations in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (internal quotation marks and citation omitted).

Exemptions to the FLSA "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 531 (2d Cir. 2009) (quoting *Arnold*, 361 U.S. at

24

392). "The burden of invoking these exemptions rests upon the employer." *Bilyou v. Dutchess Beer Distribs. Inc.*, 300 F.3d 217, 222 (2d Cir. 2002).

To meet its burden, "[a]n employer must prove that the employee is exempt by 'clear and affirmative' evidence." *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008). "The inquiry into exempt status" is "intensely fact bound and case specific." *Id.* Thus, a court may dismiss the case only "if the defense appears on the face of the complaint." *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010) (internal quotation marks omitted). If "the application of the exemption" is unclear from "bare bones pleadings," however, the Court "must remand the case for further fact-finding." *McLaughlin v. Boston Harbor Cruise Lines, Inc.*, 419 F.3d 47, 52 (1st Cir. 2005). Dismissal under Rule 12(b)(6) is appropriate "only where it is crystal clear under established law" that the FLSA exemption applies. *Id.*

## ARGUMENT

## I.  Major League Baseball is not exempt from the Fair Labor Standards Act.

Can Major League Baseball evade the basic federal wage-and-hour rules that apply to employers nationwide? That is ultimately what is at stake in this appeal. The answer is no. Neither Congress nor the Supreme Court has ever suggested that professional baseball is entitled to an exemption from the FLSA akin

to its antitrust exemption—itself a historical "aberration" justified only by inertia. *Flood v. Kuhn*, 407 U.S. 258, 282 (1972).

Nor is Major League Baseball entitled to an exemption as a seasonal "amusement or recreational establishment"—the only exemption it invokes here. 29 U.S.C. § 213(a)(3). That exemption focuses on the "length of the *Defendant's* seasonal operation." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 596 (11th Cir. 1995); *see also Hamilton v. Tulsa County Pub. Facilities Auth.*, 85 F.3d 494, 497 (10th Cir. 1996) ("[T]he FLSA exempts employees employed by amusement or recreational establishments; it does not exempt employees on the basis of the work performed at an amusement or recreational establishment."); *Marshall v. N.H. Jockey Club*, 562 F.2d 1323, 1331 n.4 (1st Cir. 1977) ("[The] exemption turns on the nature of the employer's business, not on the nature of the employee's work."); Dept. of Labor, Opinion Letter, FLSA2003-1, 2003 WL 23374597, at *3 (Mar. 17, 2003) (same). To qualify for the seasonal exemption, the employer must show either (a) that it operates for not more than seven months per year or (b) that its receipts from any six months are fewer than a third of its receipts from the other six months. 29 U.S.C. § 213(a)(3). This Major League Baseball cannot do.

As fans know, the baseball season begins when pitchers and catchers report to spring training in February and lasts through the World Series in late-October—nine months. A-33 (Am. Compl. ¶ 150). And Major League Baseball's business

operations last far beyond the season. It employs at least 435 year-round, full-time, employees. A-33 (¶ 153); *see Bridewell v. Cincinnati Reds*, 155 F.3d 828, 829 (6th Cir. 1998) (stating that a professional baseball team "operat[ing] year-round with no fewer than 120 employees in the 'off-season'" does not qualify for the seasonal exemption); *Liger v. New Orleans Hornets NBA Ltd. P'ship*, 565 F. Supp. 2d 680, 684 (E.D. La. 2008) (holding same for professional basketball team with 100 year-round employees). It operates Winter Meetings in December, three official Winter Leagues, the World Baseball Classic tournament from September through March, an Umpire Camp in November, an Urban Youth Academy, and more.[7] Although the record does not reveal the full extent of these operations because there was no discovery, even a cursory glance at Major League Baseball's business operations makes clear that they run throughout the year. Professional baseball may have a season, but it is not a seasonal establishment.[8]

---

[7] *See* Major League Baseball Offseason Leagues, MLB.com, *available at* http://perma.cc/TV9U-8677 ("[T]he Arizona Fall League . . . is a six-team league, owned and operated by Major League Baseball."); World Baseball Classic 2013 Schedule & Tickets, *available at* http://perma.cc/4FUG-76C9; Major League Baseball Umpire Camps, MLB.com, *available at* http://perma.cc/745G-3PGH; Major League Baseball Urban Youth Academy, About Us, MLB.com, *available at* http://perma.cc/P2SK-ELV2.

[8] Major League Baseball has not attempted to meet the "receipts" test, and it is unlikely that it could show that its $7 billion in annual revenues are disproportionately obtained in a few months of the year. Certainly nothing of the sort "appears on the face of the complaint." *Iowa Pub. Emps.' Ret. Sys.*, 620 at 145 (internal quotation marks omitted).

## II.    FanFest is not a separate "establishment" from Major League Baseball.

Because Major League Baseball does not qualify for the seasonal exemption, the question becomes whether it may nonetheless remove its employees from the Act's coverage for work they perform at promotional events like FanFest, on the theory that each such event is a separate "establishment" for purposes of that exemption. In answering yes, the district court reasoned that FanFest constitutes a "distinct physical place of business" and thus qualifies as an independent "establishment" under a 1970 Department of Labor regulation, 29 C.F.R. § 779.23. That reasoning ignores the Department's own test for applying this exemption—as well as the exemption's purpose, the case law, and the Department's position that a recreational "convention is not considered an exempt establishment," *DOL Handbook* § 25j05—and would lead to absurd results if adopted by this Court. Under the proper test, Major League Baseball cannot carry its burden of showing, on this record, that FanFest is a separate business establishment.

### A.    The Department of Labor uses a functional, fact-intensive, multi-prong inquiry to determine what constitutes a seasonal "establishment"—not a rigid location-only test.

The FLSA does not define "establishment," but the Department of Labor issued a regulation nearly fifty years ago giving the word its ordinary meaning: a "distinct physical place of business," rather than "an entire business or enterprise," which could "include several separate places of business." 29 C.F.R. § 779.23. The

Department lifted that common-sense definition from the Supreme Court's decision in *Walling*, which explained, in the context of the retail exception, that "Congress used the word 'establishment' as it is normally used in business and in government—as meaning a distinct physical place of business." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 496 (1945).

Although this definition applies generally, the regulation was written—like the Supreme Court decision on which it is based—with retailers in mind. It is found in a section of the regulations entitled "The Fair Labor Standards Act as Applied to Retailers of Goods or Services." 29 C.F.R. § 779. And when applied to them, it makes sense: "Congress wanted to exempt small local retail establishments," so the Department ensured that those stores would qualify for the exemption, even if they were part of chain. *Brock v. Louvers & Dampers, Inc.*, 817 F.2d 1255, 1258 (6th Cir. 1987).

But "[t]he seasonal exemption serves a completely different function than the retail and service exemption." *Id.* "While 'physical location' may be relevant in applying an exemption depending on the nature of a particular business (such as whether the employer is a retail sales company), it has little to do with an exemption based on the periods in which a business operates." *Marshall*, 562 F.2d at 1331 n.3. To take one problem, "two seasonal businesses may, by operating at different times, utilize the same location while retaining their independence" and

29

"separate identities." *Id.* It would make no sense to treat them as one "establishment" simply because they share a "single facility." *Id.* To take another problem, businesses usually do not conduct all of their operations within the four walls of a single space. They have events and functions elsewhere; their employees move around and enter different physical spaces. And when they do, those employees do not leave their FLSA protections at the door. Stagehands for concert tours who work at different venues each night, for example, "may inhabit establishments," but "in normal parlance they certainly do not constitute them." *Wirtz v. Keystone Readers Serv., Inc.*, 418 F.2d 249, 255 (5th Cir. 1969) ("Nomadic solicitors in search of customers do not by their wanderings establish any corporeality.").

**The Department's functional multi-prong test applies.** Recognizing these problems, the Department of Labor has adopted a functional, fact-sensitive approach—not a mechanical physical-location-only test—when considering what constitutes an "establishment" for purposes of the seasonal exemption. Under that approach, an entity must show three things to qualify as a separate establishment: "(a) physical separation from other activities, (b) functional operation as a separate unit with separate records and separate bookkeeping and (c) no interchange of employees between the units." 2004 Opinion Letter, 2004 WL 5303034, at *2 (citing 29 C.F.R. § 779.305); *see also* Dept. of Labor, Opinion Letter, FLSA2009-11,

30

2009 WL 1788159, at *2 (Jan. 15, 2009) (same); 1999 Opinion Letter, 1999 WL 1788159, at *1 (same). So even though "'physical separation is a prerequisite,'" it is not the *only* requirement; an entity must also show that it is sufficiently independent such that it makes sense to treat it as a separate employment unit. 2004 Opinion Letter, 2004 WL 5303034, at *2 (quoting 29 C.F.R. § 779.305). It cannot just be "a part, continuation, or extension" of another business. *DOL Handbook* § 25j09.

Although this test was devised primarily to address the two-businesses-under-one-roof problem, it is equally applicable to the converse problem presented in this case. The test is functional, not rigid. It looks beyond location because location alone is inadequate to determine whether an entity is truly a separate business unit. Like the regulations, the test demonstrates the agency's awareness that, just as there may be separate business establishments in the same location, "there may be situations in which a single establishment could include operations at more than one physical location" *Brennan v. Goose Creek Consol. Ind. Sch. Dist.*, 519 F.2d 53, 56 (5th Cir. 1975) (referring to 29 C.F.R. § 779.303); *see also* 29 C.F.R. § 779.304 (focusing on the "functions" of two parts of a business, not whether they "are separated by a partition or a wall," to determine whether "they will be considered to be a single establishment").

There is no reason to think that the Department would abandon this functional approach in favor of a strict location-only test here—particularly when

31

doing so would lead to absurd results. Consider just a few. If Major League Baseball had held FanFest in a large convention hall on the first floor of its headquarters on Park Avenue, the agency's multi-prong, functional test would apply. Why should it be any different if Major League Baseball instead holds the event at the Javits Convention Center down the street (because it needs more space, say, or because the convention hall sprung a leak)? Or what about Major League Baseball's other promotional activities and functions? Or traveling Broadway shows that switch venues every few months but run for years? Or musical bands that tour the country? The district court's location-only test is ill-suited to answer these questions; the Department of Labor's functional approach is not. That approach is entitled to deference. *Mullins v. City of New York*, 653 F.3d 104, 114 (2d Cir. 2011) (granting deference to the Department of Labor's interpretation of its own regulation promulgated under the FLSA (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *Gualandi v. Adams*, 687 F.3d 554, 561 (2d Cir. 2012).

***The case law supports the Department's view.*** The Department's approach also accords with the case law. In *Bridewell*, for instance, the janitors at Riverfront Stadium sued their employer, the Cincinnati Reds baseball team, for failing to pay the overtime required by the FLSA. 68 F.3d 136. Although the Reds argued that the stadium was the "establishment" for purposes of the seasonal exemption, the Sixth Circuit rejected that argument and held that the appropriate

unit is the baseball team, which operated even when it wasn't playing in the stadium—that is, even when it was in a different physical location. *Id.* at 138. The court's analysis captured the common-sense intuition that the relevant test was a functional one and thus identified the team and its operations as the establishment, not some artificial slice of those operations (the stadium, the number of games played in the stadium, or some other way of cutting the pie).

Other cases similarly recognize that "businesses operating at more than one location may be treated as a single establishment." *Brennan*, 519 F.2d at 56. One case, for example, "held that a food service company operating two cafeterias for a college"—one "in the central campus area"; the other "in a downtown hotel"—"was a single establishment." *Id.* (discussing *Wirtz v. Campus Chefs, Inc.*, 303 F. Supp. 1112 (N.D. Ga. 1968)). Another held that "a market, liquor store[,] and restaurant operated in conjunction with a neighboring barbeque stand constituted one establishment." *Id.* at 57 (discussing *Mitchell v. Gammill*, 245 F.2d 207 (5th Cir. 1957)). These cases, like the Department of Labor, have eschewed a rigid one-factor test in favor of a functional one. Others have too. *See, e.g.*, *Adams v. Detroit Tigers, Inc.*, 961 F. Supp. 176, 179–80 (E.D. Mich. 1997) (holding that batboys are not a separate establishment from the professional baseball team because they do not "work independently of baseball players," unlike administrative personnel, and

33

thus fall within the seasonal exemption); *Jeffery*, 64 F.3d at 593–94 (applying functional inquiry into "whether or not the Defendant's business is truly seasonal").

### B. The district court failed to apply the proper test, which Major League Baseball cannot satisfy on this record.

Once the proper test is understood, it becomes clear that this case must be reversed. The district court failed to analyze *any* of the agency's requirements other than the physical-separation requirement. By reducing the showing from a multi-prong test to a single requirement, the district court failed to hold Major League Baseball to its burden of establishing the affirmative defense of exemption.

Again, contrast this approach with the Department of Labor's. In 2004, a non-profit organization that gives horseback-riding lessons throughout the year and operates a summer camp for kids asked the Department whether the camp qualified as a separate establishment. 2004 Opinion Letter, 2004 WL 5303034, at *1. The organization provided the following facts to show why it thought the camp should qualify:

- "registration for the summer camp is conducted independently from the [organization's] group lesson programs";

- "[p]articipants pay a separate enrollment fee";

- "most summer camp participants are not enrolled in the [organization's] group lesson program";

- "[i]ncome and expenses of the summer camp are recorded separately from the [organization's] other business, and the [organization] hires a separate

staff of 15 to 20 camp counselors (aged 18), assistant instructors (aged 16), and counselors-in-training (CITs) (aged 14) for the camp'"; and

- "two regular employees of the [organization], the Camp Director and an Administrative Assistant, spend a substantial amount of time during the summer and the rest of the year administering the summer camp";

- "[t]he Camp Director, Administrative Assistant, and the [organization's] General Manager are the only employees who are involved in both the operation of the summer camp and the regular operation of the [organization]."

*Id.*

Despite all this, the Department explained that, on these facts, the summer camp did not qualify as a separate establishment unit for two reasons. *First*, the organization did not provide enough "facts to demonstrate" the first of the three requirements—that "the camp's riding and horse care instructions are physically separated from the [organization's] riding instructions. *Id.* at *2. *Second*, the organization failed the third requirement because two of its employees "spend a substantial amount of time during the summer and the rest of the year administering the summer camp." *Id.*

Under this approach—which is entitled to deference "because it rests on a 'body of experience and informed judgment to which courts and litigants may properly resort for guidance'"—Major League Baseball's case is even weaker than what the Department found lacking there. *Gualandi*, 687 F.3d at 561 (deferring to Opinion Letter); *see also Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 877 (8th Cir. 2011)

35

(deferring to Handbook). Major League Baseball has not provided *any* information at this point to show that FanFest satisfies the second and third requirements of the test—let alone that the exemption's applicability "is crystal clear." *McLaughlin*, 419 F.3d at 52. So we are left to speculate about whether FanFest has separate records and separate bookkeeping from Major League Baseball and whether any of employees from the League's permanent offices worked at the event.

Had the district court applied the proper test, it would have determined that Major League Baseball has not met its burden. Although FanFest was held in a separate physical location from League headquarters, it is part and parcel of the League's core activity: promoting baseball through a series of integrated events, much like the numerous other promotional events Major League Baseball runs throughout the year. In other words, FanFest is "a part, continuation, or extension" of professional baseball. *DOL Handbook* § 25j09. And even if it weren't, there is no evidence showing that FanFest's "activities are economically independent" of Major League Baseball's. 1999 Opinion Letter, 1999 WL 1788159, at *1. Nor is there any proof that no MLB office employee worked at FanFest, as the Department has required. 2004 Opinion Letter, 2004 WL 5303034, at *2.

### C.   FanFest is a convention, not a separate establishment.

Finally, if there is any lingering doubt about the conclusion that FanFest cannot qualify as an establishment for purposes of the seasonal exemption, it

36

should be dispelled by the Department of Labor's Handbook, which draws a bright-line rule: an amusement or recreation "convention is not considered an exempt establishment." *DOL Handbook* § 25j05. That interpretation warrants deference. *See, e.g.*, *Newman v. Advanced Tech. Innov. Corp.*, 749 F.3d 33, 37 (1st Cir. 2014); *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1041 n.6 (5th Cir. 2010); *Herman v. Collis Foods, Inc.*, 176 F.3d 912, 919 (6th Cir. 1999).

There can be no doubt that FanFest, held for several days at the Javits Convention Center, falls squarely within this category—whether defined generally as "a large meeting of people who come to a place usually for several days" because of "shared interests," *Merriam-Webster's Collegiate Dictionary* 273 (11th ed. 2004), or more specifically as "an organized meeting of enthusiasts." *New Oxford American Dictionary* (3d ed. 2010). Like Star Trek conventions or ComicCon, FanFest is both; its name alone tells us that it is an "organized meeting of enthusiasts"—*i.e.*, a festival for fans. Although it has a wide range of exhibitions, FanFest is much like a modern version of baseball-card conventions of the past.

Conventions like FanFest are best understood as outside the exemption anyway—they typically are not sufficiently separate in functional and economic terms from the organization hosting the convention. FanFest itself is integrated with Major League Baseball's other promotional activities. In 2013, Chen underwent a background check along with other workers who could be staffed to

37

FanFest, to the parade, to the 5-kilometer race, to hotels in New York to direct fans to other Major League Baseball events, or to Green Teams. A-16 (Am. Compl. ¶ 41). Chen attended those trainings, but it is unclear whether those trainings were distinct for Major League Baseball workers staffing *FanFest*, or whether the training was standard for all workers at *any* of the All-Star Game events, the World Series, the Green Teams, or for any of Major League Baseball's other events relying on unpaid workers. A-18, 34, 26 (¶¶ 50, 159, 107).

Because conventions are likely to be insufficiently distinct from the organization hosting the event, the Department has specifically determined that conventions are excluded, thereby limiting the exemption to the sort of small, seasonal employers envisioned by Congress. The alternative—allowing companies that run multiple conventions year-round to subvert the FLSA by claiming each convention as a separate establishment—would be unpalatable.

## III. At a minimum, a remand is required to develop the facts necessary to determine the appropriate level of generality at which to assess the claimed exemption.

As explained above, Major League Baseball's FanFest does not qualify as a separate FLSA-exempt "establishment." Based on the limited facts available, that conclusion is the one most faithful to the exemption's text and purpose, the precedent in other circuits, and authoritative agency interpretations. Certainly, Major League Baseball has not met its burden to prove that this case falls "plainly

and unmistakably" outside the FLSA, *Arnold*, 361 U.S. at 392—let alone made that showing with the "clear and affirmative evidence" required. *Archuleta*, 543 F.3d at 1233.

At the very least, however, a remand is required because the district court jumped the gun by dismissing this case at the pleadings stage. Every circuit court applying the FLSA's seasonal exemption has done so after some fact development—either at summary judgment or following trial. As this Court has recognized, such FLSA coverage questions often require a "particularized inquiry into the facts of each case," *Frasier v. Gen. Elec. Co.*, 930 F.2d 1004, 1008 (2d Cir. 1991), and the ultimate determinations are "necessarily fact-bound." *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 64 (2d Cir. 1997). Dismissal under Rule 12(b)(6) is therefore appropriate "only where it is crystal clear under established law" that an FLSA exemption applies. *McLaughlin*, 419 F.3d at 52. If the Court has any doubt about whether "the application of the exemption" can be determined on the "bare bones pleadings," the Court "must remand the case for further fact-finding." *Id.*

Here, such "further fact-finding" would address a range of questions at the heart of the seasonal exemption's operation. Most obviously, Major League Baseball's plea for an exemption fails because the record "does not contain facts to demonstrate" whether FanFest operated "as a separate unit with separate records and separate bookkeeping" and whether there was "no interchange of employees

39

between the units." 2004 Opinion Letter, 2004 WL 5303034, at *2. The list of unknowns is long:

- What is Major League Baseball's relationship with FanFest, and how was FanFest connected to other promotional events during the year and around the All-Star Game?

- Did FanFest have its own corporate identity or business unit?

- Did FanFest have its own payroll, recordkeeping or bookkeeping systems?

- Did FanFest have *any* paid workers of its own? (It would be quite odd, to say the least, for a for-profit entity with billions of dollars in annual revenues to operate a separate business unit with no paid employees.)

- How many paid Major League Baseball employees from headquarters worked at FanFest? Did the League treat those employees as also exempt from the FLSA or they are employed by a *separate* establishment? If there were paid Major League Baseball employees at FanFest, what percentage of the workers were they? What percentage of the paid workers? (Of course it's possible to have exempt and non-exempt employees at the same location, *cf. Marshall*, 562 F.2d at 1331, but that too requires applying a fact-sensitive test.)

- Were workers at FanFest also on "Green Teams" for the All-Star Game and for the World Series? Or for the Yankees or Mets during regular season play? Were those who worked at FanFest analogous to a central office employee who works at multiple locations operated by the same enterprise? *Cf. Hamilton*, 85 F.3d at 497.

The district court was able to grant a dismissal in Major League Baseball's favor only by ignoring all of these questions and resolving all doubts in Major League Baseball's favor. In so doing, the district court turned the motion-to-dismiss standard on its head. Instead, the district court should have resolved all factual doubts in *Chen's* favor and held Major League Baseball to its high burden to show that it falls "plainly and unmistakably" outside the FLSA, *Davis*, 587 F.3d at 531, with "clear and affirmative evidence." *Archuleta*, 543 F.3d at 1233. Had the district court done so, it would have been plain that the motion to dismiss should have been denied.

At a minimum, then, a remand for further factual development is required. The decision in this case could have far-reaching implications for whether *any* of Major League Baseball's employees who work at promotional events are covered by the FLSA, and for how similar determinations are made across a range of industries. Such an enormous, and fact-intensive, decision cannot properly be made without more factual development beyond the pleadings.

## CONCLUSION

The district court's judgment should be reversed.

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Deepak Gupta*

───────────────

Deepak Gupta
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

Justin M. Swartz
Juno Turner
Michael N. Litrownik
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, NY 10016
(212) 245-1000

</div>

August 6, 2014                   *Counsel for Plaintiff-Appellant*[9]

───────────────

[9] Counsel gratefully acknowledge the contributions of Rachel F. Homer, a rising third-year student at Harvard Law School.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify that my word processing program, Microsoft Word, counted 9,600 words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

*/s/ Deepak Gupta*
_____
Deepak Gupta

August 6, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2014, I electronically filed the foregoing Brief for Plaintiff-Appellant John Chen with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

/s/ Deepak Gupta
_____
Deepak Gupta